HERITAGE VILLAGE CHURCH AND MISSIONARY FELLOWSHIP, INC., PLAINTIFF; THE HOLY SPIRIT ASSOCIATION FOR THE UNIFICATION OF WORLD CHRISTIANITY, INTERVENING PLAINTIFF v. THE STATE OF NORTH CAROLINA, RUFUS L. EDMISTEN, ATTORNEY GENERAL OF NORTH CAROLINA; SARAH T. MORROW, SECRETARY OF HUMAN RESOURCES OF THE STATE OF NORTH CAROLINA; AND PETER S. GILCHRIST III, DISTRICT ATTORNEY FOR THE 26TH PROSECUTORIAL DISTRICT OF NORTH CAROLINA, DEFENDANT APPELLANTS

No. 87

(Filed 5 March 1980)

1. **Constitutional Law § 22; Charities and Foundations § 2— Solicitation of Charitable Funds Act—exemption of religions relying on financial support of its members—impermissible establishment of religion**

   The provision of G.S. 108-75.7(a)(1) which exempts from compliance with the licensing and reporting requirements of the Solicitation of Charitable Funds Act all religious organizations except those whose "financial support is derived primarily from contributions solicited from persons other than its own members" constitutes an impermissible establishment of religion in violation of the First Amendment of the Constitution of the United States and Art. I, §§ 13 and 19 of the Constitution of North Carolina, since the result of the statute is to exempt from regulation the more orthodox, denominational and congregational religions while subjecting to regulation those religions which spread their beliefs in more evangelical, less traditional ways.

2. **Constitutional Law § 22; Charities and Foundations § 2— Solicitation of Charitable Funds Act—excessive State entanglement with religion—impermissible establishment of religion**

   As applied to religious organizations, certain provisions of the Solicitation of Charitable Funds Act, including the requirement of audited financial

399

statements, G.S. 108-75.6(6), the requirement that extensive fiscal records be maintained and available for inspection, G.S. 108-75.12, and the grant of power to the Secretary of Human Resources to suspend or deny a license to solicit charitable funds upon finding that the applicant has or will apply "an unreasonable percentage" of the funds solicited to other than a "charitable purpose," or that the contributions solicited are not applied to the "purposes represented in the license application," or that expenses "fairly allocable" to the costs of fund-raising have exceeded or will exceed 35 percent of the total funds solicited, G.S. 108-75.18(4)-(6), *are held* to cause the State to become excessively entangled with religion so as to violate the Establishment Clause of the First Amendment of the Constitution of the United States and Art. I, §§ 13 and 19 of the Constitution of North Carolina.

Justice HUSKINS dissenting.

Justices COPELAND and BROCK join in the dissenting opinion.

APPEAL by the state from a decision of the Court of Appeals (opinion by *Judge Erwin*, in which *Judges Robert Martin* and *Mitchell* concurred), 40 N.C. App. 429, 253 S.E. 2d 475 (1979), affirming *Judge Sam Ervin III* who, finding certain aspects of G.S. 108-75.1 *et seq.* violative of the state and federal constitutions, granted in part plaintiffs' motions for summary judgment at the 15 May 1978 Session of MECKLENBURG Superior Court. We allowed petition for discretionary review under G.S. 7A-31 on 12 July 1979. This case was argued as No. 77 at the Fall Term 1979.

*Wardlow, Knox, Knox, Robinson & Freeman by H. Edward Knox and John S. Freeman, Attorneys for Original Plaintiff Appellee.*

*Melrod, Redman & Gartlan by Dorothy Sellers, and Chambers, Stein, Ferguson & Becton P.A., by Jonathan Wallas for Intervenor Plaintiff.*

*Rufus L. Edmisten, Attorney General, by William F. O'Connell, Special Deputy Attorney General, and Robert R. Reilly, Assistant Attorney General, for the State.*

EXUM, Justice.

This case involves a variety of challenges based on state and federal constitutional grounds to G.S. 108-75.1 *et seq.*, the "Solicitation of Charitable Funds Act" (Act). We hold that Section 75.7(a)(1) of the Act, which exempts from compliance all religious organizations except those whose "financial support is derived

primarily from contributions solicited from persons other than its own members" deprives the Act of that neutrality toward religion required by the Establishment Clause of the First Amendment and Article I, §§ 13 and 19, of the North Carolina Constitution. We also hold that other provisions of the Act generally cause the state to become excessively entangled with religion so as to violate these same constitutional provisions. We find it unnecessary to address other challenges to the Act.

The Act seeks to "protect the general public and public charity in the State of North Carolina" and to "prevent deceptive and dishonest statements and conduct" in the solicitation of funds for charitable purposes. G.S. 108-75.2. Its provisions are designed "to require full public disclosure of facts relating to persons and organizations who solicit funds from the public for charitable purposes, the purposes for which such funds are solicited, and their actual uses." *Ibid.* To this end the Act empowers the Department of Human Resources (Department) to issue licenses to charitable organizations and professional solicitors who wish to solicit funds for charity, in accordance with rules and regulations promulgated by the Social Services Commission (Commission) and with the provisions of the Act. G.S. 108-75.4. The Commission is to be aided by the Committee on Charitable Organizations (Committee), an appointed body which is to recommend appropriate rules and regulations to the Commission. G.S. 108-75.5. Some of the factors the Committee is to take into account in formulating its recommended rules are specified in section 75.5(c):

"The rules and regulations shall take into consideration the existence of an adequate, responsible and functioning governing board of the charitable organization, professional fund-raising counsel or professional solicitor; its chartered responsibility; its need to conduct public solicitation; the proposed uses of solicited funds; the percentage of solicited funds used for management and fund-raising expenses, fund-raising activities, including but not limited to sale and benefit affairs and program services; the accountability of the charitable organization, professional fund-raising counsel or professional solicitor and disclosure of information and financial reports to the general public; and other matters proper for the protection of the public interest with respect to public solicitation."

The Act requires that a charitable organization which intends to solicit funds within the state first apply to the Department for a license. The application must divulge such information as the names and addresses of the organization and its chapters and affiliates; its place, form, and mode of organization; the names, addresses, and occupations of its "key personnel"; the location of its financial records; the method, purposes, and extent of its fundraising activities; and such other information "as may be reasonably required by the Commission." G.S. 108-75.6. In addition, pursuant to section 75.6(6), an applicant must furnish:

> "A copy of the balance sheet and income and expense statement audited by an independent public accountant for the organization's immediately preceding fiscal year, or a copy of a financial statement audited by an independent public accountant covering, in a consolidated report, complete information as to all of the preceding year's fundraising activities of the charitable organization, showing the balance sheet, kind and amounts of funds raised, costs and expenses incidental thereto, allocation or disbursement of funds raised, changes in fund balances, notes to the audit and the opinion as to the fairness of the presentation by the accountant. This report shall conform to the accounting and reporting procedures set forth in the 'Audit Guides' published by the American Institute of Certified Public Accountants, and as may be modified from time to time by said Institute or its successor. . . ."

All information filed with the Department is treated as a public record and is open to the public for inspection. G.S. 108-75.9. Furthermore, applicant organizations are required by section 75.12 to maintain fiscal records "in accordance with the rules and regulations promulgated by the Commission" and to make such records available for inspection, upon demand, to the Department, the Commission, or the Attorney General.

Section 75.18 specifies that the Secretary of the Department (Secretary) shall revoke, suspend, or deny issuance of a license to solicit charitable funds upon a finding of one or more of the following:

> "(1) One or more of the statements in the application are not true.

(2) The applicant is or has engaged in a fraudulent transaction or enterprise.

(3) A solicitation would be a fraud upon the public.

(4) An *unreasonable percentage of the contributions solicited, or to be solicited, is not applied, or will not be applied to a charitable purpose.*

(5) The *contributions solicited, or to be solicited, are not applied, or will not be applied to the purpose or purposes as represented in the license application.*

(6) Solicitation and fund-raising expenses . . . will exceed . . . thirty-five percent (35%) of the total . . . received by reason of any solicitation and/or fund-raising activities or campaigns. . . .

(7) The applicant or lessee [sic] has failed to comply with any of the provisions of this Part, or with any rules and regulations adopted by the Commission pursuant to this Part." (Emphasis supplied.)

Charitable organizations subject to the provisions of the Act include those organizations operated for "religious" purposes. G.S. 108-75.3(1), (2). Section 75.7(a)(1), however, specifically exempts from the licensing requirements:

"A religious corporation, trust, or organization incorporated or established for religious purposes, or other religious organizations which serve religion by the preservation of religious rights and freedom from persecution or prejudice or by the fostering of religion, including the moral and ethical aspects of a particular religious faith: *Provided, however, that such religious corporation, trust or organization established for religious purposes shall not be exempt from filing a license application . . . if its financial support is derived primarily from contributions solicited from persons other than its own members, excluding sales of printed or recorded religious materials. . . .* (Emphasis supplied.)

The enforcement provision of the Act, section 75.22, provides in pertinent part that failure to file a license application, a report, document, statement, "or any other information required to be filed with the Department" may lead to the denial of issuance of a

license or to the revocation or suspension of the license then in effect. If any charitable organization "in any other way violates the provisions" of the Act, the Secretary may also deny or revoke the license. The Secretary is given authority, "upon his own motion *or upon the complaint of any person*," to investigate any charitable organization 'for possible violations of the Act. (Emphasis supplied.) Finally, the Secretary may exercise the authority granted by this section "against any charitable organization which operates under the guise or pretense" of being an organization exempted from the Act but which "is not in fact an organization entitled to such an exemption."

Plaintiff Heritage Village Church and Missionary Fellowship, Inc., filed this action in Mecklenburg Superior Court seeking declaratory and injunctive relief to bar application of the Act to its charitable solicitation activities. Plaintiff Holy Spirit Association for the Unification of World Christianity was subsequently allowed to intervene with a complaint seeking substantially the same relief.

Both plaintiffs are non-profit entities which engage in substantial religious activities throughout the state. Both derive their financial support "primarily" from contributions solicited from the general public. Both contend that, as applied to them, the Act violates the First and Fourteenth Amendments to the United States Constitution and Sections 1, 13, 14 and 19 of Article I of the Constitution of North Carolina. The state does not contest that the solicitation of funds from the general public by plaintiffs is a religious activity conducted pursuant to the religious beliefs of each plaintiff respectively.

By order of 27 June 1978 Judge Ervin found in favor of plaintiffs and permanently enjoined defendants from taking any action against plaintiffs under the Act in consequence of plaintiffs' solicitation activities. In the subsequent appeal, the Court of Appeals generally affirmed Judge Ervin's conclusions that the Act, as applied to religious activities, was constitutionally infirm in numerous respects. More particularly, the Court of Appeals held *inter alia* that:

(1) The licensing provisions of sections 75.6 and 75.18(4) act as an impermissible "prior restraint" on the exercise of religion;

(2) Paragraphs (2), (3), and (4) of section 75.18 constitute an impermissible delegation of legislative powers;

(3) The qualified exemption provision in section 75.7(a)(1) constitutes an impermissible establishment of religion;

(4) The thirty-five percent limitation on solicitation and fund-raising expenditures contained in section 75.18(6) violates plaintiff's rights of association.

[1] We affirm the Court of Appeals' holding that the partiality of the qualified exemption provided by section 75.7(a)(1) works an unconstitutional "establishment" of religion. That section's proviso, which excepts from the general exemption those religious organizations which derive financial support primarily from nonmembers, constitutes on its face a violation of Sections 13 and 19 of Article I of the North Carolina Constitution and the First Amendment to the Constitution of the United States. Since the proviso cannot be constitutionally applied to deny plaintiffs an exemption from the requirements of the Act, we find no occasion to address or pass upon the merits of the other holdings of the Court of Appeals.

We start from the premise, undisputed in the case before us, that both plaintiffs essentially are religious entities which engage in the solicitation of funds in connection with the dissemination of religious literature and the espousal of religious beliefs. Accordingly, both their organizational structures and the fund-raising activities which support them come under the constitutional protections of religious freedom. *Murdock v. Pennsylvania*, 319 U.S. 105, 109 (1943); *Cantwell v. Connecticut*, 310 U.S. 296, 304-05 (1940); *International Society for Krishna Consciousness v. Rochford*, 585 F. 2d 263 (7th Cir. 1978). It matters not that plaintiffs' evangelism may fall outside the pale of more established orthodoxies; religious freedom is constitutionally extended to the unorthodox as well. *Follett v. McCormick*, 321 U.S. 573, 576-77 (1944); *In re Williams*, 269 N.C. 68, 78, 152 S.E. 2d 317, 325 (1967). We focus, then, on whether the challenged provisions of the Act exceed state and federal constitutional limitations.

Article I, Section 13 of the North Carolina Constitution guarantees to all persons the right to worship according to the dictates of their own conscience and provides that "no human

authority shall, in any case whatever, control or interfere with the rights of conscience." Article I, section 19 of the North Carolina Constitution proscribes "discrimination by the State because of . . . religion . . . ." The First Amendment to the Constitution of the United States provides that "Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof. . . ." Both these clauses apply to state as well as federal action. *Everson v. Board of Education*, 330 U.S. 1 (1947) (Establishment Clause); *Cantwell v. Connecticut, supra*, (Free Exercise Clause).

Taken together, these provisions may be said to coalesce into a singular guarantee of freedom of religious profession and worship, "as well as an equally firmly established separation of church and state." *Braswell v. Purser*, 282 N.C. 388, 393, 193 S.E. 2d 90, 93 (1972). The Legislature oversteps the bounds of this separation when it enacts a regulatory scheme which, whether in purpose, substantive effect, or administrative procedure, tends to "control or interfere" with religious affairs, or to "discriminate" along religious lines, or to constitute a law "respecting" the establishment of religion. Stated simply, the constitutional mandate is one of secular neutrality toward religion.

We proceed to examine the Act for aspects of religious partiality. Since the contours of the neutrality requirement have been most thoroughly defined in the jurisprudence of the First Amendment's Establishment Clause, we may usefully turn to that body of law for analytical guidelines.[1]

It "is surely true that the Establishment Clause prohibits government from abandoning secular purposes in order to put an

---

1. Although the remainder of our discussion borrows heavily from the Establishment Clause analysis developed by the United States Supreme Court, our decision today is grounded no less on the requirements of Sections 13 and 19 of Article I of the North Carolina Constitution. It has long been recognized that the organic law of our state "expressly denies religion any place in the supervision or control of secular affairs." *Rodman v. Robinson*, 134 N.C. 503, 509, 47 S.E. 19, 21 (1904). And although the differences in terminology in the relevant North Carolina and federal constitutional provisions may support in some cases differences in scope of their application, we recognize today that the neutrality demanded by the First Amendment is also compelled by the conjunction of Sections 13 and 19 of Article I. It will be a rare case in which an instance of religious discrimination on the part of the state, prohibited by Section 19, will not also occasion a species of religious favoritism which tends to "control or interfere with the rights of conscience" protected by Section 13.

imprimatur on one religion, or on religion as such, or to favor the adherents of any sect or religious organization." *Gillette v. United States*, 401 U.S. 437, 450 (1971). However, the state is not required to pretend a sterile disinterest in all affairs of religion; "[n]o perfect or absolute separation is really possible." *Walz v. Tax Commission*, 397 U.S. 664, 670 (1970). Rather, "[t]he problem, like many problems in constitutional law, is one of degree." *Zorach v. Clauson*, 343 U.S. 306, 314 (1952). Certainly Government may "effect no favoritism among sects," *Abington School District v. Schempp*, 374 U.S. 203, 305 (1963) (opinion of Goldberg, J.), and the circumstances of legislative categories that may net religious activities or organizations must be strictly reviewed by this Court "to eliminate, as it were, religious gerrymanders." *Walz v. Tax Commission, supra* at 696 (opinion of Harlan, J.). Moreover, adherence to the policy of neutrality will prevent the kind of governmental *involvement* in religious affairs "that would tip the balance toward government control of churches or governmental restraint on religious practice." *Id*. at 670. As the Supreme Court noted in *Lemon v. Kurtzman*, 403 U.S. 602, 612 (1971):

> "[The authors of the First Amendment] did not simply prohibit the establishment of a state church or a state religion, an area history shows they regarded as very important and fraught with great dangers. Instead they commanded that there should be 'no law *respecting* an establishment of religion.' A law may be one 'respecting' the forbidden objective while falling short of its total realization. A law 'respecting' the proscribed result, that is, the establishment of religion, is not always easily identifiable as one violative of the Clause. A given law might not *establish* a state religion but nevertheless be one 'respecting' that end in the sense of being a step that could lead to such establishment and hence offend the First Amendment." (Emphasis original.)

Thus, for a statute to pass muster under the strict test of Establishment Clause neutrality, it must pass the three-prong review distilled by the Supreme Court from "the cumulative criteria developed . . . over many years":

> "First, the statute must have a secular legislative purpose; second, its principal or *primary effect* must be one that neither advances nor inhibits religion . . . finally, the statute

must not foster 'an excessive government entanglement with religion'." *Id.* at 612-613 (Citations omitted.) (Emphasis supplied.) *See also, Roemer v. Maryland Public Works Board,* 426 U.S. 736, 748 (1976).

Applying these criteria[2] to the statutory provisions before us, we note first that there can be little argument that the whole tenor of the Act reveals a valid secular purpose. The clear intent underlying the enactment is to protect the public from fraudulent and deceptive conduct in the solicitation of funds in the name of charity. *See* G.S. 108-75.2. It is well within the police power of the state to enact appropriate laws to protect the public from incapacity, fraud, or oppression in the conduct of a business or a general activity. *State v. Harris,* 216 N.C. 746, 755-56, 6 S.E. 2d 854, 861 (1940); *see* 16 Am. Jur. 2d, Constitutional Law § 423 and cases cited therein. Our inquiry thus turns to whether the Act is "appropriate" in the context of its *regulatory effect on religious organizations.*[3]

To the degree that the Act imposes restraints or requirements upon activities and institutions within the religious sphere, its "principal or primary effect" must neither "advance" nor "inhibit" religion. This prohibition represents the essence of the Establishment Clause in its most basic sense: the state may not enact laws which "aid one religion, aid all religions, or *prefer* one religion over another." *Everson v. Board of Education,* 330

---

2. "It is well to emphasize, however, that the tests must not be viewed as setting the precise limits to the necessary constitutional inquiry, but serve only as guidelines with which to identify instances in which the objectives of the Establishment Clause have been impaired." *Meek v. Pittenger,* 421 U.S. 349, 358-59 (1975).

3. Since our decision today applies Establishment Clause analysis to find that the Act engenders constitutionally *inappropriate* burdens on and governmental surveillance of some religious organizations but not others, we express no opinion as to whether the prevention of fraud in charitable solicitations may be characterized as one of sufficient overriding public concern or represents a "compelling state interest" such as to justify under the *Free Exercise Clause* a less intrusive manner of state regulation of religious solicitation. It should be noted, however, that to pass muster under the Free Exercise Clause, any statutory restrictions on religious freedom must represent the least restrictive means of achieving a compelling state end, and it would be incumbent upon the state to demonstrate that no alternative modes of regulation would combat abuses in religious solicitation without equally infringing First Amendment rights. *See, e.g., Sherbert v. Verner,* 374 U.S. 398, 406-07 (1963). These aspects of Free Exercise analysis are extensively discussed in Tribe, *American Constitutional Law* § 14-10 (1978).

Church v. State

U.S. 1, 15 (1947). (Emphasis supplied.) However, an across the board exemption from state regulation of a broadly defined class of religious entities may avoid First Amendment problems by the very breadth of the class immunized from governmental interference. Although such an exemption represents *some* contact between church and state, in the sense that the Legislature has spoken to the position of religion in the context of the regulatory scheme, its effect is one of benevolent neutrality, partaking of neither sponsorship nor hostility toward religious affairs. *See, e.g., Walz v. Tax Commission, supra*, 397 U.S. at 672-73.[4] On the other hand, a more narrowly drawn exemption might benefit some religious organizations—those which meet the criteria of its classifications—while leaving others falling outside its ambit open to the burden of state regulation. In such a case, the exemption's particularity may effect a preference for some identifiable types of religion over others, and the classification must be strictly scrutinized for potential, impermissible divisiveness. *See, e.g., Committee for Public Education v. Nyquist*, 413 U.S. 756, 794 (1973) (narrowness of the benefitted class is "an important factor" in measuring the potential religious divisiveness of a legislative measure affecting religion); *Public Funds for Public Schools of N. J. v. Byrne*, 590 F. 2d 514, 518 (3d Cir. 1979), *aff'd mem.*, 99 S.Ct. 2818 (1979) ("breadth in the benefitted class helps to guarantee that the advantages to religious institutions will be incidental to secular ends and effects"); *Kosydar v. Wolman*, 353 F. Supp. 744, 753-54 (S.D. Ohio 1972), *aff'd mem. sub nom. Grit v. Wolman*, 413 U.S. 901 (1973) (classifications which disproportionately benefit some religions are "highly suspect"). "Obviously the more discriminating and complicated the basis of classification for an exemption—even a neutral one—the greater the potential for state involvement in evaluating the character of the organiza-

---

4. In *Walz*, the Supreme Court held that the First Amendment was not violated by the granting of property tax exemptions to a broad class of non-profit organizations, including religious organizations. As was noted by Chief Justice Burger:

"The general principle deducible from the First Amendment and all that has been said by the Court is this: that we will not tolerate either governmentally established religion or governmental interference with religion. Short of those expressly proscribed governmental acts there is room for play in the joints productive of a benevolent neutrality which will permit religious exercise to exist without sponsorship and without interference." 397 U.S. at 669.

tions." *Walz v. Tax Commission*, supra, 397 U.S. at 698-99 (opinion of Harlan, J.).

## I. THE ACT'S UNEQUAL TREATMENT
## OF RELIGIOUS ORGANIZATIONS

[1]   With these principles in mind, we note that section 75.7(a)(1) of the Act grants an exemption from the licensing and reporting requirements to a broadly defined class of religious organizations. The very indefiniteness of the exemption guarantees that its scope is wide; indeed, it is difficult to imagine how any organization with a colorable claim to bona fide religious purposes or activities would not fall within one or another of the exemption's classifications.[5] The proviso, however, which immediately follows in the same section denies the benefits of the exemption to those religious organizations which derive their financial support "primarily" from contributions solicited from "persons other than [their] own members." The Court of Appeals held that this qualification to the general exemption works an impermissible establishment of religion. We agree.

Although "member" is nowhere defined in the Act, section 75.3(12) does define "membership" as a "status . . . which provides services and confers a bona fide right, privilege, professional standing, honor or other direct benefit, in addition to the right to vote, elect officers, or hold office." Assuming arguendo that the term "member" as used in section 75.7(a)(1)'s proviso connotes someone with "membership" status, and considering the spirit of the Act and the purposes which it seeks to accomplish, *see, e.g., Stevenson v. City of Durham*, 281 N.C. 300, 303, 188 S.E. 2d 281, 283 (1972), we presume the intent of the proviso is (1) to distinguish between religious organizations presumably somehow accountable to persons providing financial support, *i.e.*, their "members," and those religious organizations which are not

---

5. The part of section 75.7(a)(1) under discussion exempts any religious organization "established for religious purposes" and any other religious organizations which "serve religion" by the fostering of religion or the preservation of religious rights. The Act defines "religious purposes" as "maintaining or propagating religion or supporting public religious services, according to the rites of a particular denomination." G.S. 108-75.3(17). "Religion" however, is nowhere defined. The result is an exemption sufficiently broad to satisfy the requirement of religious neutrality. *All* groups that can fairly be considered "religious" in nature fall within the exemption's perimeters.

presumably so accountable because their financial support is largely provided by non-members, and (2) to insure that only the latter are subject to the Act's accountability requirements. The intended purpose of the proviso may thus be secular in nature, in that it seeks to promote the Act's policy "to require full public disclosure of facts relating to . . . organizations [which] solicit funds *from the public* for charitable purposes. . . ." G.S. 108-75.2. (Emphasis supplied.) Nevertheless, the *effect* of the proviso is to alter the original exemption's religious neutrality. The result is a qualified exemption which favors only those religious organizations which solicit primarily from their own members. The inescapable impact is to accord benign neglect to the more orthodox, denominational, and congregational religions while subjecting to regulation those religions which spread their beliefs in more evangelical, less traditional ways. This the state may not do.

The burden imposed by the Act's reporting requirements are in no wise *de minimis*. To note but one, section 75.6(6) requires as a condition of licensing that an applicant organization furnish the state with a detailed financial statement, independently audited according to nationally accepted accounting and reporting procedures. However commendable as a sound business practice, such an audit does not spring full blown without considerable expense and administrative coordination. The primary effect of the proviso is to place the full range of burdens attendant to the licensing procedure, including the audit requirement, solely upon those religious organizations which primarily go to the public with their religious messages and requests for the financial support needed to propagate them. The result is an inhibition by the state of a specific mode of religious practice—that of spreading one's religious beliefs via personal visitations, use of the news media, and distribution of literature among the public at large. Yet such "an age-old type of evangelism," whether carried out in the public streets or over the public media, has "as high a claim to constitutional protection as the more orthodox types" of congregational practices. *Murdock v. Pennsylvania, supra*, 319 U.S. at 110.

The state argues that when a religious organization solicits primarily from non-members, the state's interest in regulating the accountability of public solicitation thereby increases. There is no showing in the record, however, that "member" or "membership"

status in a religious organization *ipso facto* carries with it a legally enforceable right to demand and receive an accounting of the organization's fund-raising and solicitation activities. Nor is there the slightest suggestion that member funded religious organizations do in fact regularly account to their members with the same degree of specificity and audit safeguards as that which the Act requires of non-member funded organizations. Thus the conclusion is unavoidable that the proviso works to place member funded and public funded religious organizations on an unequal footing in the marketplace of religious ideas. Moreover, even if it could be shown that member funded religious groups were accountable to their members with the same kind of specificity required in the Act, this would not provide support for making only non-member funded religious groups so accountable *to the state*.

The state concedes that the acts of soliciting monies for the support of religious organizations, including those in this case, and the giving of those monies, are expressions of religious faith. These acts are seen by those who engage in them as the soliciting for, and the giving to, God that which is God's. Some religious organizations, such as plaintiffs' here, as we have noted, see their mission as being to evangelize and solicit from the public at large. They eschew the "membership" form of organization. Others receive support from both members and non-members in varying degrees. Still others rely solely on members. *All do so on the basis of their religious tenets.* A statute which *on its face* seeks to regulate all of the first kind of religious organization, only some of the second, and none of the third must, finally, make its classification on the basis of a religious test. The clear import of the Establishment Clause is, therefore, that a statute cannot *on its face* subject some religious organizations to state regulation and at the same time exempt others on the basis of the percentage of "members" which contribute, respectively, to their support.

We note that two recent federal district court decisions have reached similar conclusions in dealing with the partiality of exemptions granted religious organizations. In *Valente v. Larson*, Civil No. 4-78-453 (D. Minn., *prelim. inj. granted* July 5, 1979), U.S. District Court Judge Miles Lord granted a preliminary injunction barring state officials from requiring plaintiff Holy Spirit Association for the Unification of World Christianity to comply with the

provisions of the Minnesota Charitable Solicitations Act, Minn. Stat. §§ 309.50 *et seq.* Substantially equivalent to the Act challenged in the instant case, the Minnesota statute exempts from its reporting requirements those religious organizations which receive more than one-half of their contributions from "members." Minn. Stat. § 309.515. Judge Lord's order upheld the Report and Recommendation made by United States Magistrate Robert Renner, which pointed out, *id.* at 19, that:

> "Members of the public who contribute to a church which solicits 49% of its contributions from the public have no more contact with it, nor is that church any more answerable to them, than if the church solicited 51% of its contributions from the public. Yet, in both instances, good faith solicitors, as well as the public, have the same interest to be protected by the State. *Clearly, whatever its legislative purpose, the* [Minnesota] *Act has the immediate effect of subjecting some churches to far more rigorous requirements than others."* (Emphasis supplied.)

In *Bob Jones University v. United States*, 468 F. Supp. 890 (D.S.C. 1978), the court rejected the government's contention that the exemption from federal taxes generally granted to charitable organizations by I.R.C. § 501(c)(3) should be applied only to those organizations which operate in harmony with federal desegregation policies. Noting that "[c]onflict with the Establishment Clause lurks within the [government's] construction of the exemption provision," the court concluded that:

> "The construction of § 501(c)(3) argued by the government would do away with the general grant of tax exemptions to all religious organizations, which was found in *Walz* to constitute an act of benevolent neutrality, and, in effect, transforms the statute into a law that provides a special tax benefit, *because favorable tax status will be accorded only to some, not all, religious organizations.* Since only selected religious institutions would receive exemption under defendant's interpretation of the law, tax exemption provided by the section no longer manifests neutrality towards all religions but, rather, favors some over others. The effect is to strengthen those religious organizations whose religious practices do not conflict with federal public policy and to

discriminate against those religious groups whose convictions violate these secular principles. *The unavoidable effect is the law's tending toward the establishment of the approved religions.*" 468 F. Supp. at 900-901. (Emphasis supplied.)

Our decision today accords with the Establishment Clause principles affirmed in these cases. Neither the First Amendment nor Article I, Sections 13 and 19, of the State Constitution permit the state to aid some religions by burdening others.

## II. THE ACT'S EXCESSIVE ENTANGLEMENT WITH RELIGION

[2] Considerations of the excessive entanglement between church and state threatened by the Act's substantive requirements additionally compel us to conclude that plaintiffs may not constitutionally be denied an exemption under section 75.7(a)(1). Should plaintiffs or any other religious organization be subjected to the full panoply of strictures contemplated by the Act, we would be faced with precisely the sort of "sustained and detailed administrative relationships for enforcement of statutory or administrative standards," *Walz v. Tax Commission, supra,* 397 U.S. at 675, that have been repeatedly condemned by the Supreme Court. *See, e.g., NLRB v. Catholic Bishop of Chicago,* 59 L.Ed. 2d 533, 542 (1979); *Committee for Public Education v. Nyquist, supra,* 413 U.S. at 794-95; *Lemon v. Kurtzman, supra,* 403 U.S. at 619-622. A continuous state surveillance of the financial records of applicant organizations inheres in the Act's auditing requirements, discussed above, as well as in the requirement that applicants maintain fiscal records in accordance with Commission regulations and make such records available for inspection upon demand. G.S. 108-75.12. The potential result of such a course of state inspection and evaluation can be seen in section 75.18(4)-(6), wherein the Secretary is empowered to suspend or deny a license upon a finding that the applicant has or will apply "an unreasonable percentage" of the funds solicited to other than "a charitable purpose," or that the contributions solicited are not applied to the "purposes represented in the license application," or that expenses of an organization "fairly allocable" to the costs of fund-raising have exceeded or will exceed 35 percent of the total funds solicited. As applied to religious organizations, the enforcement of these provisions inevitably entangles the state and its agencies in a persistent inquiry into whether particular expen-

ditures of a religious organization are secular or religious in nature, or whether the religious expenditures support the same religious purposes represented in the organization's license application. In *Lemon v. Kurtzman, supra,* 403 U.S. 602, the Supreme Court struck down certain government subsidies to church-related schools on the grounds that an excessive monitoring of the schools' affairs would be required to guarantee that the grants would be used solely for secular purposes. Certainly no less of an "entanglement" defect is latent in a statutory scheme requiring the state to ensure, through a "comprehensive, discriminating, and continuing state surveillance," *id.* at 619, that a "reasonable" quantum of a religious organization's expenditures are devoted to religious purposes. *See, e.g., Fernandes v. Limmer,* 465 F. Supp. 493, 504-05 (N.D. Tex. 1979); *see also Surinach v. Pesquera de Busquets,* 604 F. 2d 73, 76-78 (1st Cir. 1979).

Moreover, the scope of entanglement posed here goes far beyond the state's policing a religious organization's administrative records. The potential exists for the state not only to substitute its own judgment as to the substantive "purpose" of a particular expenditure, but also to inject itself into the very center of religious disputes.[6] Absent narrow circumstances of outright fraud or collusion or other specific illegality, the propriety of a religious organization's expenditures can be evaluated only by reference to the organization's own doctrinal goals and procedures. The question of proper purpose is an ecclesiastical one, and its resolution necessarily entails an interpretative inquiry into possible deviations from religious policy. "But this is exactly the inquiry that the First Amendment prohibits . . . ." *Serbian Orthodox Diocese v. Milivojevich,* 426 U.S. 696, 713 (1976). *See also Presbyterian Church in the United States v. Mary Elizabeth Blue Hull Presbyterian Church,* 393 U.S. 440 (1969); *Atkins v. Walker,* 284 N.C. 306, 200 S.E. 2d 641 (1973); *Trustees v. Seaford,*

---

6. Section 75.22(b) of the Act enables the Secretary, "upon the complaint of any person," to investigate any organization for possible violations of the Act. Section 75.22(e) empowers the Attorney General to bring an action for injunctive or other relief against an organization "whenever the funds raised by solicitation activities are not devoted or will not be devoted to the charitable purposes of the charitable organization." It is not unthinkable that an interested party, whether a dissenting member, a disgruntled contributor, or an advocate of opposing doctrine, would seek to use these provisions to involve the state in a dispute over the fiscal decisions of a religious organization.

16 N.C. (1 Dev. Eq.) 453 (1830). Constant state evaluation of the religious "purpose" of an organization's expenditures is no less than constant state evaluation of the religious content of the organization's activities. The result is "a relationship pregnant with dangers of excessive government direction." *Lemon v. Kurtzman, supra,* 403 U.S. at 620.

We do not intend to intimate that the state will inevitably seek to apply the Act's provisions to religious organizations in such a way as to dictate the bounds of religious purpose. But the potential for such abuse is clear when the factors discussed above are considered cumulatively. We find that the Act, as applied to plaintiff religious organizations, is characterized by excessive entanglements between the state and religion and poses significant risks of secular interference with the rights of conscience.

For all the foregoing reasons, we hold that plaintiffs may not constitutionally be denied an exemption from the Act. The Court of Appeals' decision that the qualification to the exemption in section 75.7(a)(1) of the Act effects an unconstitutional establishment of religion is

Affirmed.

Justice HUSKINS dissenting.

The purpose of the "Solicitation of Charitable Funds Act," G.S. 108-75.1, *et seq.*, is to "protect the general public and public charity in the State of North Carolina" and "to prevent deceptive and dishonest statements and conduct" in the solicitation of funds for charitable purposes. G.S. 108-75.2. In pursuance of this concededly valid legislative goal the General Assembly has determined that only those religious organizations whose "financial support is derived primarily from contributions solicited from persons other than its own members, excluding sales of printed or recorded materials", G.S. 108-75.7(a)(1), need be subject to the regulatory provisions of the Act. The majority holds that such a qualified exemption, which excludes some but not all religious organizations from the licensing provisions of the Act, per se works an unconstitutional establishment of religion. The majority reasons that the Establishment Clause does not permit the state, in enacting valid secular legislation which affects religious

organizations, to make *any* classification "which on its face, *for whatever reason*" (emphasis supplied) excludes some but not all religious groups from a regulatory scheme. In my view, the conclusion reached by the majority finds no support in the jurisprudence of the First Amendment's Establishment Clause.

Carefully read, the Establishment Clause cases do not at their farthest reach support the proposition that the state, when enacting valid secular legislation, may not make distinctions which prevent some but not all religiously motivated conduct from falling within the ambit of state regulation. See generally, *Meek v. Pittenger*, 421 U.S. 349, 359, 44 L.Ed. 2d 217, 228, 95 S.Ct. 1753, 1760 (1975); *Committee for Public Education v. Nyquist*, 413 U.S. 756, 771, 37 L.Ed. 2d 948, 962, 93 S.Ct. 2955, 2965 (1973); 16A Am. Jur. 2d, Constitutional Law, § 467; Annot., 37 L.Ed. 2d 1147, § 3(b) (1974). Indeed, the only two Establishment Clause cases dealing with attacks on regulatory legislation founded on disparate legislative treatment of "religious claims" uniformly hold that such distinctions do not invariably work an establishment if there is a rational, neutral, secular basis for the lines the government has drawn and if claimant is unable to demonstrate that the facially valid classifications in effect constitute religious gerrymanders. *Gillette v. United States*, 401 U.S. 437, 28 L.Ed. 2d 168, 91 S.Ct. 828 (1971) (8-1 decision) (In granting an exemption for conscientious objectors, the government may distinguish between religious beliefs which oppose participation in all wars and religious beliefs which oppose participation in only unjust wars.); *McGowan v. Maryland,* 366 U.S. 420, 6 L.Ed. 2d 393, 81 S.Ct. 1101 (1961) (8-1 decision) (Government may establish Sunday as a secular day of rest.).

The holdings in *Gillette* and *McGowan* are premised on the sound notion that the freedom of religion guaranteed by state and federal constitutions does not withdraw the government's authority to act in areas where secular interests happen to coincide with religious interests. The freedom of religion guaranteed by the First Amendment embraces both the freedom to believe and the freedom to act on the basis of one's religious belief. However, while the freedom to believe is virtually immune from intrusion by the state, the right of action may be subject to reasonable and nondiscriminatory regulation designed to safeguard valid secular interests. Such regulation of conduct cannot infringe unduly upon

the exercise of protected activities. Accordingly, a statute which regulates religiously motivated conduct will be upheld (1) if it furthers an important governmental interest; (2) if the governmental interest is unrelated to the suppression of religion; (3) if the incidental restrictions on protected activities are no greater than is essential to the furtherance of that interest. *Cantwell v. Connecticut*, 310 U.S. 296, 84 L.Ed. 1213, 60 S.Ct. 900 (1940). *See generally, Poulos v. New Hampshire*, 345 U.S. 395, 97 L.Ed. 1105, 73 S.Ct. 760 (1953); 16A Am. Jur. 2d, Constitutional Law, § 473.

Significantly, the United States Supreme Court in *Cantwell v. Connecticut, supra,* has indicated that the solicitation of funds by religious organizations is an area of valid secular concern and has established standards by which to judge the validity of legislation in this area. With respect to the government's interest in regulation the Court states:

> "Nothing we have said is intended even remotely to imply that, under the cloak of religion, persons may, with impunity, commit frauds upon the public. Certainly penal laws are available to punish such conduct. Even the exercise of religion may be at some slight inconvenience in order that the state may protect its citizens from injury. Without doubt a state may protect its citizens from fraudulent solicitation by requiring a stranger in the community, before permitting him publicly to solicit funds for any purpose, to establish his identity and his authority to act for the cause which he purports to represent. The state is likewise free to regulate the time and manner of solicitation generally, in the interest of public safety, peace, comfort or convenience."

310 U.S. at 306-07. With respect to the standards to be applied to determine the validity of regulation in the area the Court states:

> "The general regulation, in the public interest, of solicitation, which does not involve any religious test and does not unreasonably obstruct or delay the collection of funds, is not open to any constitutional objection, even though the collection be for a religious purpose. Such regulation would not constitute a prohibited previous restraint on the free exercise of religion or interpose an inadmissible obstacle to its exercise."

---

Church v. State

---

310 U.S. at 305.[1]

In the Establishment Clause cases, the principles enunciated above find expression in the uniformly followed rule "that a law protecting a valid secular interest is not invalid as one 'respecting an establishment of religion' merely because it also incidentally benefits one or more or all, religions, or because it incidentally enhances the capability of religion, or religious institutions to survive in society." 16A Am. Jur. 2d, Constitutional Law, § 467. *Accord, Meek v. Pittenger, supra,* 421 U.S. at 359; *Committee for Public Education v. Nyquist,* supra, 413 U.S. at 762; *Gillette v. United States, supra; McGowan v. Maryland, supra;* Annot., 37 L.Ed. 2d 1143, § 3(b) (1974). It is clear then, that the requirement of neutrality imposed on government by the Establishment Clause does not absolutely preclude it from distinguishing between religious claims when enacting secular regulations in areas of valid governmental concern. Neutrality requires only that the classifications made by the government bear a substantial relation to the secular purposes advanced by the legislation. *Gillette v. United States*, supra. Otherwise put, the decision to exempt some but not all religious activities from a regulatory scheme must be "secular in purpose, evenhanded in operation, and neutral in primary impact." *Id.*, 401 U.S. at 450. The mere fact that an otherwise valid regulatory scheme exempts some but not all religious activities from the burden of regulation does not "in mechanical fashion" compel the conclusion that the scheme "works an establishment of religion." *Id.*, 401 U.S. at 449.

Finally, it should be noted that when enacting regulatory legislation in areas where secular interests happen to coincide with religious interests, it is not impermissible under establishment doctrine for the legislature to attempt to accommodate free exercise values by exempting from regulation those religious activities the regulation of which isn't absolutely necessary to accomplish the legislative scheme. *Gillette v. United States*, supra, 401 U.S. at 453. Such accommodation is in line with " 'our happy tradition' of 'avoiding unnecessary clashes with the dictates of conscience.' " *Id.* (citations omitted). " 'Neutrality' in matters of

---

1. The licensing scheme under attack in *Cantwell* was invalidated because it vested in a government official the power to determine what a religious cause was. However, in the language quoted in text, the Court stressed that a properly drafted licensing scheme could be applied to religious organizations.

religion is not inconsistent with 'benevolence' by way of exemptions from onerous duties, *Walz v. Tax Commission*, 397 U.S. at 669, 25 L.Ed. 2d at 701, so long as an exemption is tailored broadly enough that it reflects valid secular purposes." *Id.*, 401 U.S. at 454.

Application of these principles to the instant case compels the conclusion that the legislative exemption under attack is secular in purpose, evenhanded in operation, and neutral in primary impact. At the outset, it should be reemphasized that unquestionably, the state has a valid secular interest in regulating the public solicitation of funds by religious organizations, even though the collection be for religious purposes. *Cantwell v. Connecticut*, supra, 310 U.S. at 305-07. In terms of the Establishment Clause this means that when regulating religiously motivated conduct in this area, the state may make distinctions among religious organizations if those classifications are substantially related to the secular interests advanced by the legislation. *Gillette v. United States*, supra.

The purpose of the legislation in question is to "protect the general public and public charity in the State of North Carolina; to require full public disclosure of facts relating to persons and organizations who solicit funds from the public for charitable purposes, the purposes for which such funds are solicited, and their actual uses; and to prevent deceptive and dishonest statements and conduct in the solicitation of funds for or in the name of charity." G.S. 108-75.2. In essence, the regulatory goal is to remedy the special problems created by public charities, religious or otherwise, "who solicit funds from the public for charitable purposes." *Id.* The exemption from regulation granted by G.S. 108-75.7(a)(1) to certain religious organizations comports precisely with this valid secular interest by subjecting to regulation only those religious organizations "whose financial support is derived primarily from contributions solicited from persons other than its own members . . . ." Moreover, in section 75.7(a)(1), distinctions among religious organizations are made solely in terms of the precise conduct which the state is seeking to regulate, viz., whether financial support is derived primarily from public solicitations. On its face, section 75.7(a)(1) simply does not distinguish on the basis of religious affiliation or religious belief. It is clear, then, that the preference accorded in section 75.7(a)(1)

to religious organizations which are primarily member-funded is not made for the purpose of putting "an imprimatur on one religion, . . . or to favor the adherents of any sect or religious organization." *Gillette v. United States,* supra, 401 U.S. at 450. Rather, the purpose of the exemption is to subject to regulation only those religious organizations which clearly present the problems which the Act seeks to remedy. Such a classification is rational and clearly related to the purposes of the Act.

The majority suggests that no rational distinctions can be drawn between member-funded and nonmember-funded religious organizations for the purposes of regulating the public solicitation of funds by charitable organizations. Such a conclusion overlooks the fact that the purpose of the Act is rather specialized. The Act is concerned with the integrity and operating efficiency of public charity. The primary goal of the Act is to preserve public confidence in public charity by means of a permit system which stresses full disclosure of facts relating to the collection and application of funds and which establishes certain minimum standards of operating efficiency. In sum, the concern of the legislature is not with organizations who raise their funds internally, but rather with the specialized problems presented by organizations who solicit charitable contributions from the public. Given the legislative intent, it is eminently reasonable for the legislature to subject to regulation only those religious organizations "whose financial support is derived primarily from persons other than its own members . . . ." G.S. 108-75.7(a)(1). These are the organizations which clearly present the regulatory problems which the legislature is trying to address.

I note, moreover, that the legislative decision to exempt from coverage those religious organizations whose financial support is derived primarily from their members constitutes a creditable attempt by the legislature to accommodate free exercise values. For while the legislature has the authority to regulate public solicitation by religious organizations, it must take care not to unnecessarily hamper such activities, which are protected by the First Amendment. *Cantwell v. Connecticut, supra.* The legislative exemption in the instant case skillfully balances free exercise values with the valid need for state regulation by subjecting to regulation only those religious organizations which clearly present the problems sought to be remedied by the legislative

scheme, viz., those organizations whose financial support is derived primarily from the public. Such benevolent exemption from onerous duties does not violate the constitutional command of state neutrality in matters of religion when, as here, the exemption is tailored broadly enough to reflect valid secular purposes. *Gillette v. United States*, supra; *Walz v. Tax Commission*, 397 U.S. 664, 25 L.Ed. 2d 697, 90 S.Ct. 1409 (1970).

The majority cites a number of cases for the *general proposition* that any legislative benefit or exemption to religion which is not all-inclusive is highly suspect and likely to constitute an establishment. *Committee for Public Education v. Nyquist*, supra; *Public Funds for Public Schools of N. J. v. Byrne*, 590 F. 2d 514 (3d Cir.), *aff'd mem.*, 99 S.Ct. 2818 (1979); *Kosydar v. Wolman*, 353 F. Supp. 744 (S.D. Ohio 1972), *aff'd mem. sub. nom. Grit v. Wolman*, 413 U.S. 901 (1973). The cases cited by the majority, however, deal exclusively with the application of the Establishment Clause in the wholly different context of financial aid by the state to private education. In such cases the legislative purpose is to provide aid to a particular sector of private education.[2] Consequently, the state's capacity to make classifications among the private schools or pupils attending such schools within the particular sector being aided is necessarily circumscribed. In order to pass muster under the Establishment Clause the state aid must go to virtually *all* private schools or pupils in the sector being aided. Thus, in this factual context, the state is for the most part limited to an "all or none" choice in terms of the classifications it may make. I note moreover that in the context of government aids to private education it is easier to establish that an appropriation constitutes a religious gerrymander or has an invalid primary effect of establishing religion. Thus, a facially neutral bill to aid *all* private schools in a state where virtually all recipients of aid would be "church-related or religiously affiliated" would violate the Establishment Clause. See *Meek v. Pittenger, supra; Committee of Public Education v. Nyquist, supra*. The elevation

---

2. For purposes of this analysis I assume arguendo that the aid which the state seeks to give is of a type which may constitutionally be given to sectarian schools or their pupils. Compare *Hunt v. McNair*, 413 U.S. 734 (1973); *Tilton v. Richardson*, 403 U.S. 672 (1971); *Board of Education v. Allen*, 392 U.S. 236 (1968); *Everson v. Board of Education*, 330 U.S. 1 (1947) with *Meek v. Pittenger*, 421 U.S. 349 (1975); *Committee for Public Education v. Nyquist*, 413 U.S. 756 (1973); *Levitt v. Committee for Public Education*, 413 U.S. 472 (1973).

by the majority of the *results* in these cases into fixed principles of general application fails to heed Chief Justice Burger's admonition in *Walz v. Tax Commission, supra*:

> "The Establishment and Free Exercise Clauses of the First Amendment are not the most precisely drawn portions of the Constitution. The sweep of the absolute prohibitions in the Religion Clauses may have been calculated; but the purpose was to state an objective, not to write a statute. In attempting to articulate the scope of the two Religion Clauses, the Court's opinions reflect the limitations inherent in formulating general principles on a case-by-case basis. The considerable internal inconsistency in the opinions of the Court derives from what, in retrospect, may have been too sweeping utterances on aspects of these clauses that seemed clear in relation to the particular cases but have limited meaning as general principles."

397 U.S. at 668.

The majority suggests that the primary impact of the classification made by the state "is to accord benign neglect to the more orthodox, denominational, and congregational religions while subjecting to regulation those religions which spread their beliefs in more evangelical, less traditional ways."[3] It is true that the Establishment Clause "forbids subtle departures from neutrality, 'religious gerrymanders,' as well as obvious abuses." *Gillette v. United States*, supra, 401 U.S. at 452 (citations omitted). Still, a claimant alleging that a facially neutral regulatory scheme constitutes a gerrymander "must be able to show *the absence of a neutral, secular basis* for the lines government has drawn." *Id.* (Emphasis supplied.) My analysis of the exemption provided by G.S. 108-75.7(a)(1) has demonstrated that its purpose is to relieve from regulation those religious organizations whose methods of financing do not clearly present the regulatory problems in the area of public solicitation which the legislature is seeking to address. Additionally, the classification attempts to ac-

---

3. In fact, G.S. 108-75.7(a)(1) exempts from regulation those religious organizations whose nonmember funding is derived exclusively from the "sales of printed or recorded religious materials." Thus, protection is accorded in the Act to the "age-old type of evangelism" which was held in *Murdock v. Pennsylvania*, 319 U.S. 105, 110 (1943), to have "as high a claim to constitutional protection as the more orthodox types" of congregational practices.

commodate free exercise values by exempting from regulation as much religious solicitation as is consistent with the state's concededly valid interest in preserving the integrity and operating efficiency of public charity. Thus, G.S. 108-75.7(a)(1) "serves a number of valid purposes having nothing to do with a design to foster or favor any sect, religion, or cluster of religions." *Id.* Since the classifications are clearly related to the advancement of a valid state interest, any benefits accorded to one or more religious institutions are incidental and do not constitute an establishment.

In the second part of its opinion the majority additionally concludes that the *exemption* granted under G.S. 108-75.7(a)(1) constitutes an establishment because it fosters an excessive government entanglement in religion. This conclusion is clearly incorrect. The pertinent inquiry in an establishment case is whether the *aid* or *benefit* granted by the state to religion in general or particular religions is of a type which violates the constitutional command of state neutrality with respect to religion. See, *e.g., Walz v. Tax Commission,* supra. In terms of the entanglement test the pertinent inquiry is whether the *aid* or *benefit* being granted by the state to religion is of a type which cannot be administered without excessive government involvement in the affairs of religion or religious organization. Thus, even though a program of state *aid* to private schools is secular in purpose and primary effect, it may nonetheless foster government entanglement in the affairs of sectarian schools because of the complex state surveillance necessary to ensure proper application of the funds being given by the state. *See, e.g., Lemon v. Kurtzman,* 403 U.S. 602, 29 L.Ed. 2d 745, 91 S.Ct. 2105 (1971). Analysis of the *benefit* granted by the state in the instant case compels the conclusion that the benefit granted by the exemption in section 75.7(a)(1) does not carry with it the seeds of an extensive and continuing government entanglement. Quite to the contrary, the *benefit* accorded by the exemption is one of freedom from further state regulation. The only state involvement connected with the benefit granted is that of determining whether an organization qualifies for an exemption. Thus, once a religious organization qualifies, it is not subject to any further regulation by the state. Clearly then, the exemption or benefit granted does not foster excessive government "entanglement" with religion as that term is used in the jurisprudence of the Establishment Clause.

The majority's conclusion in Part II that the Act fosters an excessive entanglement with religion is based on the regulatory *burdens* that would be imposed on plaintiffs were they to be denied an exemption under section 75.7(a)(1). The majority reasons that exposure to the regulatory mechanisms of the Act would unduly burden plaintiffs' religious activities. In effect, the majority's analysis focuses on the extent of the *burden* imposed by *other sections* of the Act on plaintiffs' *free exercise* of religion. Thus, the issue raised by the majority in Part II of its opinion is not whether the exemption in section 75.7(a)(1) constitutes an establishment; rather, the true issue raised is whether the provisions of the act impermissibly infringe upon the free exercise of religion.

"Untangling" the lines of analyses in this manner permits examination of the free exercise problems raised by the Act in their proper context. Thus, my analysis of the free exercise problems raised by the Act proceeds on the assumption that in section 75.7(a)(1) the General Assembly may, consistent with establishment principles, subject to regulation some but not all religious organizations when legislating in the field of public solicitation. Such a conclusion, however, is not determinative of the extent to which the state may regulate these organizations. "For despite a general harmony of purpose between the two religious clauses of the First Amendment, the Free Exercise Clause no doubt has a reach of its own." *Gillette v. United States, supra,* 401 U.S. at 461. Thus, while the exemption granted in section 75.7(a)(1) withstands constitutional challenge on establishment grounds, it may well be that sections of the Act, as applied to plaintiffs, are invalid on free exercise grounds. The key point to be kept in mind is that the constitutional problems posed by the exemption in section 75.7(a)(1) are separate and distinct from the problems which may be posed by other sections of the Act. The invalidation of other sections of the Act on free exercise grounds does not, *ipso facto,* compel invalidation of the exemption granted in section 75.7(a)(1).

That the state has a compelling interest in regulating the public solicitation of funds by religious and secular organizations is conclusively established in *Cantwell v. Connecticut, supra.* Moreover, *Cantwell* suggests that the inclusion of religious organizations in a general scheme for the licensing of such

organizations is a permissible means of advancing the state's interest in protecting its citizens from fraudulent solicitations and in preserving the integrity and fiscal responsibility of public charity. "The general regulation in the public interest, of solicitation which does not involve any religious test and does not unreasonably obstruct or delay the collection of funds, is not open to any constitutional objection, *even though the collection be for a religious purpose.* Such regulation would not constitute a prohibited previous restraint on the free exercise of religion or interpose an inadmissible obstacle to its exercise." *Cantwell v. Connecticut, supra,* 310 U.S. at 305. (Emphasis supplied.) *See also, id.* at 306-07. Thus, according to *Cantwell,* a properly drafted licensing scheme is a less restrictive means of achieving the state's compelling interest in regulating the public solicitation of funds by religious and secular organizations.

With a few exceptions, the provisions of the Act comport with the standards articulated in *Cantwell* and hence, are not open to constitutional objection on free exercise grounds. The primary burden imposed on religious organizations by the Act is the completion of an application for a license to solicit. See G.S. 108-75.6. The information which religious organizations must supply on their application relates clearly to the state interest in preserving the integrity and fiscal responsibility of public charity and in protecting its citizens from fraudulent solicitations. Thus, a religious organization, like any other organization which intends to solicit funds, must give its name, address, names and addresses of key personnel, a copy of an audited balance sheet which conforms to the "Audit Guides" published by the American Institute of Public Accountants, location of financial records, method of solicitation, use of professional fund-raising counsel and solicitors, length and areas of solicitation, purpose of solicitation, names of individuals responsible for the final distribution of funds. *Id.* Moreover, the only inspection authority retained by the state is over the *financial records* maintained by the soliciting organization: "Upon demand, such records shall be made available to the Department, the Commission or the Attorney General for inspection." G.S. 108-75.12.

Such requirements are general in nature, do not involve a religious test, and do not unreasonably obstruct or delay the collection of funds. The most intrusive requirement imposed on

religious organizations is the submission of an audited financial statement. G.S. 108-75.6(6). The impact of this requirement is considerably softened by a proviso which permits simplified reporting by organizations that raise less than $25,000 in the preceding fiscal year. *Id.* The compilation of a financial statement, audited or simplified, has at best a tenuous impact on matters of religious practice or belief. The primary effect of such disclosure is to reveal the flow of money into and out of the organizational structure. To the extent that management of solicited funds constitutes a religious practice or belief it must yield to the state's interest in seeing that reasonable amounts of solicited funds are used for the purposes for which they are solicited. Moreover, it would seem that sound accounting practices would in the long run tend to advance rather than retard an organization's ability to solicit funds.

Equally important in the statutory scheme are the standards by which the Secretary of Human Resources is to revoke, suspend or deny issuance of a license to a charitable organization. G.S. 108-75.18. These standards must be carefully scrutinized for imposition of an invalid religious test. Free exercise of religion precludes the denial, revocation or suspension of a license from being based on a determination that the purpose of the solicitation is not "religious" in nature or that funds are not being used for "religious" purposes. *Cantwell v. Connecticut,* supra. Such a grant of power improperly sets up the state as an arbiter of religious practice in violation of the Free Exercise Clause. *Id.* Thus, absent circumstances of outright fraud, collusion or other specific illegality, the state must accept at face value the assertion that the purposes for which funds are solicited are "religious" in nature. However, the state may, consistent with free exercise values, revoke, suspend or deny issuance of a license on the grounds that funds solicited are not being applied or will not be applied for the purposes, "religious" or otherwise, listed in the application. Such a standard limits the state to the neutral inquiry whether funds solicited will be applied to the purpose or purposes represented in the application.

Section 75.18 sets out the seven grounds upon which the Secretary shall revoke, suspend, or deny issuance of a license. The fourth ground of disqualification is that "[a]n unreasonable percentage of the contributions solicited, or to be solicited, is not

applied, or will not be applied to a charitable purpose." G.S. 108-75.18(4). The term "charitable purpose" as defined in the Act encompasses any "religious purpose." See G.S. 108-75.3(2). Thus, as applied to religious organizations, subsection four improperly sets up the Secretary as an arbiter over religious practice. Accordingly, I would hold that subsection four as applied to plaintiffs constitutes an impermissible prior restraint over religion in violation of the Free Exercise Clause. The regulatory goal improperly advanced by subsection four is accomplished in a constitutionally permissible manner by subsection five which permits disqualification upon a neutral determination that "the contributions solicited or to be solicited, are not applied, or will not be applied to the purpose or purposes as represented in the license application." G.S. 108-75.18(5). The remaining grounds of disqualification limit the state to neutral, nonreligious inquiries such as the truth of statements made in the license application, whether an applicant has engaged in a fraudulent transaction, whether an undue percentage of solicitations are being absorbed by fund-raising expenses. See generally, G.S. 108-75.18.[4]

The only other free exercise problem posed by the Act is the definition of the term "member" in the proviso which denies the exemption from regulation to those religious organizations whose "financial support is derived primarily from contributions solicited from persons other than its own members, excluding sales of printed or religious materials . . . ." G.S. 108-75.7(a)(1). The Act does not specifically define what constitutes membership in a religious organization. Without a narrow, technical definition

---

4. G.S. 108-75.18(4) permits the Secretary to revoke, suspend or deny issuance of a license to a charitable organization upon a finding that solicitation and fundraising expenses have exceeded or will exceed 35% of the total funds solicited. This subsection, however, grants discretion to the Secretary to allow for higher expenses "[i]n the event special facts or circumstances are presented showing that expenses higher than thirty-five percent (35%) were not or will not be unreasonable." This hardship clause protects the First Amendment free speech interests of organizations "whose primary purpose is not to provide money or services for the poor, the needy or other worthy objects of charity, but to gather and disseminate information about and advocate positions on matters of public concern." *Schaumburg v. Citizens For A Better Environment*, 40 CCH S.Ct. Bull. p. 815, 830 (Filed February 20, 1980). Accordingly, the percentage limitation in subsection (4) is not subject to challenge on free speech grounds. *See Id.* at p. 831, n. 9. *Accord, National Foundation v. Fort Worth*, 415 F. 2d 41 (5th Cir. 1969), *cert. denied*, 396 U.S. 1040 (1970) (cited approvingly by the Court in footnote nine of its opinion in *Schaumburg*).

of this term, the state is left free to determine what constitutes membership in a religious organization. Such power vested in the state would constitute a form of religious censorship prohibited by the Free Exercise Clause. *Cantwell v. Connecticut, supra.* Accordingly, to avoid this constitutional infirmity I would hold that the term "member" is to be defined in accordance with the rules, regulations, or rituals of the particular religious organization under scrutiny; provided, however, that the term "member" shall not include those persons who are granted a membership upon making a contribution as the result of solicitation; provided further, that the term "member" shall include only those persons who are in a position to reasonably ascertain whether contributions solicited by the organization will be applied to the purpose or purposes as represented in the license application. See generally, G.S. 108-75.3(12); 108-75.18(5). Such a definition permits the state to advance its secular interest in the charitable solicitations of religious organizations without unnecessarily infringing on the free exercise of religion.

In its discussion of the Act the majority suggests that there might be less restrictive means of achieving the state's compelling interest in preserving the integrity and efficiency of public charity. I note first that *Cantwell v. Connecticut*, supra, conclusively establishes that a *permit system* is a constitutionally permissible means of achieving this end. I note further that the purpose of the Act, in addition to protecting the general public from fraud, is to preserve public confidence in public charity. See G.S. 108-75.2. Fraud statutes alone are not sufficient to advance this interest. A permit system which stresses public disclosure of facts relating to the collection and application of funds and which establishes certain minimum standards of operating efficiency is better suited to the advancement of the dual state goals of preventing fraud and preserving the valuable services rendered to society by the institution of public charity. I note finally by way of comparison that fraud legislation may in fact be a more restrictive means of advancing the state's interest in preventing fraudulent solicitations by religious organizations. This is so because as applied to a "religious" defendant, the element of "fraudulent intent" necessarily involves deeper scrutiny of a defendant's religious beliefs. *See generally, United States v. Ballard*, 322 U.S. 78, 88 L.Ed. 1148, 64 S.Ct. 882 (1944). In com-

parison, the legislative scheme in the instant case limits its scrutiny to the essentially neutral inquiry of whether solicited funds are being applied in reasonable amounts to the purposes represented in the license application.

The majority suggests that state surveillance of the audited financial statements to be submitted by religious organizations which solicit in the state impermissibly infringes upon the free exercise of religion. Compare G.S. 108-75.4 with 108-75.6(6). In my view, such impositions are no more onerous for a religious organization than filing a state or federal income tax return or filing for tax-exempt status under the Internal Revenue Code. Additionally, the majority raises the possibility that a disgruntled contributor or advocate of an opposing doctrine might cause the Secretary to unnecessarily investigate a religious organization for violations of the Act. However, the same potential for abuse exists in any valid state regulation or criminal statute. If such potential for abuse is invariably a matter of constitutional import, then no valid state regulation which affects religion can withstand constitutional scrutiny.

G.S. 108-75.20(h)(2) prohibits solicitation of charitable funds in North Carolina by a person who has been enjoined from such solicitation in any other state. This section is violative of due process and for purposes of this dissent requires no further discussion. G.S. 108-75.7(a)(7) exempts from regulation veteran's organizations, organizations of volunteer firemen, and certain others if all of their fund-raising activities are carried on by members and such members receive no direct or indirect compensation therefor. This section is violative of equal protection and for purposes of this dissent requires no further discussion.

In Section 3 of Chapter 747 of the 1975 Session Laws the General Assembly enacted a severability clause for the "Solicitation of Charitable Funds Act" which provides as follows:

"If any provision of this act, or the application of such provision to any person or under any circumstances shall be held invalid, the remainder of this act, or the application of such provisions to persons or under any circumstances, other than those as to which it shall have been held invalid, shall not be affected thereby."

Church v. State

I have concluded that G.S. 108-75.18(4), as applied to religious organizations, violates the Free Exercise Clause; that G.S. 108-75.20(h)(2), on its face, is violative of due process; and that G.S. 108-75.7(a)(7), on its face, is violative of equal protection. Accordingly, I would discard these sections under the severability clause while preserving the sound sections of the Act as discussed above.

In effect, the majority's interpretation of the Religion Clauses seems to accord with the interpretation of the United States District Court in *Christian Echoes National Ministry Inc. v. United States*, 470 F. 2d 849 (10th Cir. 1972), *cert. denied*, 414 U.S. 864 (1973). In that case the District Court held that the federal government could not decide whether plaintiff's activities were political or religious in nature for purposes of determining plaintiff's exempt status under the Internal Revenue Code. " 'To do so' ", concluded the court, " 'would require an interpretation of the meaning of the church doctrine espoused by plaintiff and a determination of the relative significance of the religion of plaintiff to its activities.' " 470 F. 2d at 856 (quoting conclusions of law made by the District Court). My response to this interpretation accords with that of the Tenth Circuit Court of Appeals, which reversed:

> "We know of no legal authority supporting the conclusion set forth above. Such conclusion is tantamount to the proposition that the First Amendment right of free exercise of religion, ipso facto, assures no restraints, no limitations and, in effect, protects those exercising the right to do so unfettered."

470 F. 2d at 856.

For the reasons stated, I respectfully dissent from the majority's holding that the exemption in G.S. 108-75(a)(1) establishes religion in violation of the First Amendment and Article I, Section 13 of the North Carolina Constitution. I also dissent from the majority's holding that the exemption in section 75.7(a)(1) fosters an unconstitutional entanglement with religion.

Since I conclude that establishment principles do not preclude application of the Act in its entirety to these plaintiffs, I reach the questions discussed by the Court of Appeals relative to the constitutionality of various sections of the Act. For the reasons stated in this dissent, I concur in the conclusion of the

Court of Appeals that G.S. 108-75.18(4) is an impermissible prior restraint on plaintiffs' free exercise of religion. Additionally, I would uphold the conclusions of the Court of Appeals that G.S. 108-75.20(h)(2) violates the Due Process Clause of the Fourteenth Amendment, and that G.S. 108-75.7(a)(7) violates the Equal Protection Clause of the Fourteenth Amendment.

I would reverse the Court of Appeals as to all other sections of the Act which it held to be void. With the exceptions noted above, I find no merit in the constitutional objections raised by plaintiffs.

For the reasons stated, I respectfully dissent from the majority opinion.

Justices COPELAND and BROCK join in this dissent.