In the Matter of: The Appeal of Springmoor, Inc. and Ammons, Inc. from the Denial of Applications for Exemption by the Wake County Board of Equalization and Review for 1994

No. 79PA97

(Filed 3 April 1998)

**Constitutional Law § 119 (NCI4th); Taxation § 28 (NCI4th)— homes for aged, sick, infirm—exclusion of property from taxation—religious or Masonic affiliation—violation of establishment of religion clause**

Subpart (v) of N.C.G.S. § 105-275(32), which sets out the requirement of religious or Masonic affiliation for the exclusion from the tax base of property owned by a home for the aged, sick or infirm pursuant to subsection (32), violates the prohibition against the establishment of religion found in the First Amendment of the United States Constitution and Article I, § 13 of the North Carolina Constitution. Furthermore, subpart (v) is an integral part of the definition of a qualifying home for the aged, sick or infirm contained in subsection (32) and may not be severed therefrom so that the entire subsection (32) must fail.

Justice Lake dissenting.

Appeal of Wake County pursuant to N.C.G.S. § 7A-30(1) from a unanimous decision of the Court of Appeals, 125 N.C. App. 184, 479 S.E.2d 795 (1997), reversing an order of the Property Tax

1

Commission entered 16 November 1995 and holding N.C.G.S. § 105-275(32) unconstitutional in part. On 5 June 1997, the Supreme Court allowed discretionary review of an additional issue. Heard in the Supreme Court 14 October 1997.

*Wake County Attorney's Office, by Shelley T. Eason, Deputy Wake County Attorney, for appellant Wake County.*

*James M. Kimzey for appellees Springmoor, Inc., and Ammons, Inc.*

*North Carolina Association of County Commissioners, by James B. Blackburn III, General Counsel, and Kimberly M. Grantham, Assistant General Counsel, amicus curiae.*

*Poyner & Spruill, L.L.P., by Susanne F. Hayes and Robin T. Morris, on behalf of Non-Profit Qualifying Homes for the Aging, amicus curiae.*

*Michael F. Easley, Attorney General, by George W. Boylan, Special Deputy Attorney General, for the State, amicus curiae.*

FRYE, Justice.

The issue in this case is whether N.C.G.S. § 105-275(32) is unconstitutional and, if so, whether the allegedly unconstitutional subpart (v) may be severed, allowing the remainder of the statute to stand.

Springmoor, Inc. (Springmoor) is a nonprofit North Carolina corporation which manages and operates a self-contained residential community for the elderly, also called Springmoor, in Raleigh, North Carolina. Springmoor leases all of the real property on which it is located from Ammons, Inc. (Ammons) under a lease which provides that Springmoor will pay all *ad valorem* taxes assessed on the property.

On 27 January 1994, taxpayers Ammons and Springmoor applied for property tax exemptions for this real property and for personal property used in the operation of the retirement community. On 22 February 1994, the Wake County Tax Assessor denied both requests. Subsequently, the Wake County Board of Equalization and Review agreed with the assessor and denied the requests for exemption. Both parties appealed to the North Carolina Property Tax Commission (Commission).

## IN RE SPRINGMOOR, INC.

[348 N.C. 1 (1998)]

The Commission concluded that Springmoor met all the requirements for exclusion under N.C.G.S. § 105-275(32) except that of religious or Masonic affiliation as required by subpart (v). The Commission affirmed Wake County's denial of tax relief, but noted that it did not have the authority to act upon constitutional challenges to tax statutes. Springmoor and Ammons filed timely notice of appeal to the Court of Appeals and excepted to the Commission's order on the ground that N.C.G.S. § 105-275(32)(v) is unconstitutional. Wake County cross-assigned error, asserting that the Commission's order denying the tax exclusion is sustainable on the basis that the entire statutory provision N.C.G.S. § 105-275(32) is unconstitutional.

The Court of Appeals concluded that N.C.G.S. § 105-275(32)(v) violates the prohibition against the establishment of religion found in Article I, Section 13 of the North Carolina Constitution and the Establishment Clause of the First Amendment to the United States Constitution as applied to the states through the Fourteenth Amendment. The Court of Appeals applied the doctrine of severability, however, and allowed the remaining provisions of N.C.G.S. § 105-275(32) to stand.

N.C.G.S. § 105-275 is entitled "Property classified and excluded from the tax base." The constitutional challenge in this case is solely against N.C.G.S. § 105-275(32) and, more specifically, subpart (v) of that subsection. N.C.G.S. § 105-275(32) provides that the following property "shall not be listed, appraised, assessed, or taxed":

Real and personal property owned by a home for the aged, sick, or infirm, that is exempt from tax under Article 4 of this Chapter, and used in the operation of that home. The term "home for the aged, sick, or infirm" means a self-contained community that (i) is designed for elderly residents; (ii) operates a skilled nursing facility, an intermediate care facility, or a home for the aged; (iii) includes residential dwelling units, recreational facilities, and service facilities; (iv) the charter of which provides that in the event of dissolution, its assets will revert or be conveyed to an entity organized exclusively for charitable, educational, scientific, or religious purposes, and which qualifies as an exempt organization under Section 501(c)(3) of the Internal Revenue Code of 1986; *(v) is owned, operated, and managed by one of the following entities:*

**IN RE SPRINGMOOR, INC.**

[348 N.C. 1 (1998)]

   a. *A congregation, parish, mission, synagogue, temple, or similar local unit of a church or religious body;*

   b. *A conference, association, division, presbytery, diocese, district, synod, or similar unit of a church or religious body;*

   c. *A Masonic organization whose property is excluded from taxation pursuant to G.S. 105-275(18); or*

   d. *A nonprofit corporation governed by a board of directors at least a majority of whose members elected for terms commencing on or before December 31, 1987, shall have been elected or confirmed by, and all of whose members elected for terms commencing after December 31, 1987, shall be selected by, one or more entities described in A., B., or C. of this subdivision, or organized for a religious purpose as defined in G.S. 105-278.3(d)(1)*; and

(vi) has an active program to generate funds through one or more sources, such as gifts, grants, trusts, bequests, endowment, or an annual giving program, to assist the home in serving persons who might not be able to reside at the home without financial assistance or subsidy.

N.C.G.S. § 105-275(32) (1997) (emphasis added). Under this statute, a "home for the aged, sick, or infirm" "shall not be listed, appraised, assessed, or taxed," meaning that it is excluded from the tax base. In order to be excluded from the tax base, such a home for the aged, sick, or infirm, under subpart (v) of N.C.G.S. § 105-275(32), must be owned, operated, and managed by a religious or Masonic organization, in addition to meeting the other requirements of subsection (32).

    Both Wake County, appellant in this case, and Ammons and Springmoor, appellees, contend that subpart (v) of N.C.G.S. § 105-275(32) constitutes a law respecting an establishment of religion. For this reason, this Court, on 16 October 1997, instructed the Attorney General to file a brief, pursuant to N.C.G.S. § 1-260, addressing the constitutionality of N.C.G.S. § 105-275(32). The Attorney General filed a brief, on 17 November 1997, taking the position that N.C.G.S. § 105-275(32) is unconstitutional. However, a group of continuing-care homes for the elderly which are owned and operated by churches argues as *amicus curiae* in this case that N.C.G.S. § 105-275(32) is constitutional. Because we do not lightly strike down

## IN RE SPRINGMOOR, INC.

[348 N.C. 1 (1998)]

an enactment of the General Assembly, we address the issue of constitutionality.

Article I, Section 13 of the North Carolina Constitution guarantees that

> [a]ll persons have a natural and inalienable right to worship Almighty God according to the dictates of their own consciences, and no human authority shall, in any case whatever, control or interfere with the rights of conscience.

N.C. Const. art. I, § 13. Article I, Section 19 guarantees that "[n]o person shall be denied the equal protection of the laws; nor shall any person be subjected to discrimination by the State because of . . . religion." N.C. Const. art I, § 19. The First Amendment to the United States Constitution provides that "Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof." U.S. Const. amend. I.

This Court has previously stated that "[t]aken together, these provisions . . . coalesce into a singular guarantee of freedom of religious profession and worship, *as well as an equally firmly established separation of church and state.*" *Heritage Village Church & Missionary Fellowship, Inc. v. North Carolina*, 299 N.C. 399, 406, 263 S.E.2d 726, 730 (1980) (quoting *Braswell v. Purser*, 282 N.C. 388, 393, 193 S.E.2d 90, 93 (1972)) (emphasis added). "Stated simply, the constitutional mandate is one of secular neutrality toward religion." *Id.* We have recognized that while the religion clauses of the state and federal Constitutions are not identical, they secure similar rights and demand the same neutrality on the part of the State. *Id.* at 406 n.1, 263 S.E.2d at 730 n.1. Thus, we may utilize Establishment Clause jurisprudence to examine legislation for "aspects of religious partiality" prohibited by both constitutions. *Id.* at 406, 263 S.E.2d at 730.

*Amicus curiae* homes contend that N.C.G.S. § 105-275(32) does not breach the required separation of church and state and that the Court of Appeals erred in holding otherwise. They rely on *Walz v. Tax Comm'n of N.Y.*, 397 U.S. 664, 25 L. Ed. 2d 697 (1970), which held that a New York statute granting tax exemptions to religious organizations for property used solely for religious worship did not violate the religion clauses of the First Amendment. The United States Supreme Court explained that "[t]he grant of a tax exemption is not sponsorship since the government does not transfer part of its revenue to churches but simply abstains from demanding that the

church support the state." *Id.* at 675, 25 L. Ed. 2d at 705. However, we conclude that *Walz* does not control the outcome of this case because N.C.G.S. § 105-275(32) differs in purpose, function, and constitutional authority from the statute analyzed and upheld in *Walz*.

The New York statute at issue in *Walz* provided in pertinent part:

"Real property owned by a corporation or association organized exclusively for the moral or mental improvement of men and women, or for religious, bible, tract, charitable, benevolent, missionary, hospital, infirmary, educational, public playground, scientific, literary, bar association, medical society, library, patriotic, historical or cemetery purposes . . . and used exclusively for carrying out thereupon one or more of such purposes . . . shall be exempt from taxation as provided in this section."

*Id.* at 667 n.1, 25 L. Ed. 2d at 700 n.1 (quoting N.Y. Real Prop. Tax Law § 420(1)) (alterations in original).

The authority for granting these property tax exemptions was a provision of the New York Constitution which stated in relevant part:

"Exemptions from taxation may be granted only by general laws. Exemptions may be altered or repealed except those exempting real or personal property used exclusively for religious, educational or charitable purposes as defined by law and owned by any corporation or association organized or conducted exclusively for one or more of such purposes and not operating for profit."

*Id.* at 666-67, 25 L. Ed. 2d at 700 (quoting N.Y. Const. art. 16, § 1).

Central to the Supreme Court's holding in *Walz* was that New York had "not singled out one particular church or religious group or even churches as such; rather, it ha[d] granted exemption to all houses of religious worship within a broad class of property owned by nonprofit, quasi-public corporations." *Id.* at 673, 25 L. Ed. 2d at 703-04. The Court therefore found that the tax exemption for houses of worship "simply spare[d] the exercise of religion from the burden of property taxation levied on private profit institutions." *Id.* at 673, 25 L. Ed. 2d at 704.

North Carolina has similar constitutional and statutory provisions that allow the General Assembly to exempt from property tax properties used for religious purposes. Article V, Section 2(3) of the North Carolina Constitution reads in relevant part:

**IN RE SPRINGMOOR, INC.**

[348 N.C. 1 (1998)]

*Exemptions.* Property belonging to the State, counties, and municipal corporations shall be exempt from taxation. The General Assembly may exempt cemeteries and property held for educational, scientific, literary, cultural, charitable, or religious purposes . . . . Every exemption shall be on a State-wide basis and shall be made by general law uniformly applicable in every county, city and town, and other unit of local government.

N.C. Const. art. V, § 2(3). Under this authority, the General Assembly has enacted the following statutory tax exemptions: N.C.G.S. §§ 105-278.2(a) (burial property), -278.3 (real and personal property used for religious purposes), -278.4 (real and personal property used for educational purposes), -278.5 (real and personal property of religious educational assemblies used for religious and educational purposes), -278.6 (real and personal property used for charitable purposes), -278.7 (real and personal property used for educational, scientific, literary, or charitable purposes), and -287.8 (real and personal property used for charitable hospital purposes). These statutes require whole and exclusive use of the property for the constitutionally authorized purpose and disallow the exemption to the extent that any part of the property is used for other purposes.

This group of statutes, like the statute challenged in *Walz*, exempts from taxation a broad range of property based upon usage. It is not challenged that the North Carolina property tax exemption equivalent to that challenged in *Walz*, N.C.G.S. § 105-278.3 (1997), is constitutional under the analysis used by the United States Supreme Court in *Walz*. Religious organizations whose property is *used exclusively for religious or other constitutionally authorized purposes* may share in the benefit bestowed upon other groups which the State has determined have a "beneficial and stabilizing influence[] in community life." *Walz*, 397 U.S. at 673, 25 L. Ed. 2d at 704. Indeed, all of the fifty states have similar tax exemptions for property used for religious purposes. *See id.* at 676, 25 L. Ed. 2d at 705; *see also* John W. Whitehead, *Tax Exemption and Churches: A Historical and Constitutional Analysis*, 22 Cumb. L. Rev. 521, 547 (1992). Such tax exemptions constitute an acceptable accommodation of religion, which has been called "benevolent neutrality." *Walz*, 397 U.S. at 669, 25 L. Ed. 2d at 702. As the Court in *Walz* noted, tax exemption for *churches* "tends to complement and reinforce the desired separation" of church and state. *Id.* at 676, 25 L. Ed. 2d at 705.

However, the statute at issue in this case, N.C.G.S. § 105-275(32), is of an entirely different character from the one analyzed and upheld

**IN RE SPRINGMOOR, INC.**

[348 N.C. 1 (1998)]

in *Walz*. N.C.G.S. § 105-275 designates special classes of property that are excluded from the tax base and that "shall not be listed, appraised, assessed, or taxed." The constitutional authority for this statute is Article V, Section 2(2), which gives the General Assembly the power of "classification," as distinguished from "exemption." N.C.G.S. § 105-275. The relevant provision of Article V, Section 2(2) reads:

> *Classification.* Only the General Assembly shall have the power to classify property for taxation, which power shall be exercised only on a State-wide basis and shall not be delegated. No class of property shall be taxed except by uniform rule . . . .

N.C. Const. art. V, § 2(2).

Under this authority, the General Assembly has enacted a broad range of classifications from tangible personal property imported and stored in the state for further shipment (subsection (2)) to computer software (subsection (40)). N.C.G.S. § 105-275. Included among these classifications is subsection (32), "property owned by a home for the aged, sick, or infirm." However, subsection (32) goes on to define such homes to include only those owned, operated, and managed by religious or Masonic organizations.

This statute's function is to describe a separate class of property for exclusion from the tax base, rather than to provide a tax exemption to religious organizations for property used for religious purposes. The relevant class of property at issue here is "property owned by a home for the aged, sick, or infirm." N.C.G.S. § 105-275(32). It is entirely appropriate to consider, in the context of determining whether this classification is proper, only the legislative treatment of all similarly situated nonprofit homes for the aged, sick, or infirm.

We conclude that our Court of Appeals correctly distinguished *Walz* from the instant case. As explained by the Court of Appeals:

> Unlike *Walz*, the broad classification of property addressed by the statute in question here is "[r]eal and personal property owned by a home for the aged, sick, or infirm, . . . and used in the operation of that home." G.S. 105-275(32). This broad classification, standing alone without further qualification, would undeniably be a constitutionally permissible classification. The alleged constitutional infirmity here arises because G.S. 105-275(32) distinguishes, within this class of "home[s] for the aged, sick and

**IN RE SPRINGMOOR, INC.**

[348 N.C. 1 (1998)]

> infirm," between those that are religiously affiliated and those that perform essentially the same functions but lack any religious affiliation, and G.S. 105-275(32) grants exemption to the former while denying exemption to the latter.

*In re Springmoor, Inc.*, 125 N.C. App. 184, 191, 479 S.E.2d 795, 799 (1997) (alterations in original). We agree with the Court of Appeals that the classification drawn by N.C.G.S. § 105-275(32) is "narrowly divided so as to prefer religion over non-religion" and that there is "no legitimate secular objective sufficient to justify this preference." *Id.* (citing *Texas Monthly, Inc. v. Bullock*, 489 U.S. 1, 17, 103 L. Ed. 2d 1, 14 (1989)).

Without question, the power to classify property for tax purposes belongs to the General Assembly. N.C. Const. art. V, § 2(2); *see, e.g., Lenoir Fin. Co. v. Currie*, 254 N.C. 129, 118 S.E.2d 543, *appeal dismissed*, 368 U.S. 289, 7 L. Ed. 2d 336 (1961). However, the limitation upon this power of classification is that "it must be reasonable and not capricious or arbitrary." *Leonard v. Maxwell*, 216 N.C. 89, 93, 3 S.E.2d 316, 320, *appeal dismissed*, 308 U.S. 516, 84 L. Ed. 439 (1939). The classification must bear a " 'substantial relation to the object of the legislation, so that all persons similarly circumstanced shall be treated alike.' " *Id.* at 94, 3 S.E.2d at 321 (quoting *F.S. Royster Guano Co. v. Virginia*, 253 U.S. 412, 415, 64 L. Ed. 989, 990-91 (1920)); *see also In re Appeal of Martin*, 286 N.C. 66, 76, 209 S.E.2d 766, 773 (1974).

Clearly, promoting the safety and welfare of the aged and infirm is a legitimate, secular legislative purpose. *See In re Appeal of Barbour*, 112 N.C. App. 368, 379, 436 S.E.2d 169, 177 (1993); *Tripp v. Flaherty*, 27 N.C. App. 180, 185, 218 S.E.2d 709, 712 (1975). Appellees Springmoor and Ammons urge, and the Court of Appeals determined, that by enacting N.C.G.S. § 105-275(32) the General Assembly "clearly intended 'to promote communities for the elderly without giving a tax windfall to all residential property owners.' " *Springmoor*, 125 N.C. App. at 192, 479 S.E.2d at 800 (quoting *Barbour*, 112 N.C. App. at 378, 436 S.E.2d at 176). However, the case cited for this assertion, *In re Appeal of Barbour*, did not address the specific issue in controversy here. The Court of Appeals in *Barbour* specifically declined to address a constitutional challenge on the basis of discrimination against nonreligious, non-Masonic homes for the aged, sick, or infirm. *Barbour*, 112 N.C. App. at 374, 436 S.E.2d at 173-74. The court in *Barbour* merely held that N.C.G.S. § 105-275(32) was not uncon-

stitutionally discriminatory against individual residential property owners. *Id.* at 378, 380, 436 S.E.2d at 176, 177.

The classification made by N.C.G.S. § 105-275(32) is challenged in the instant case because it makes preferential tax treatment contingent upon religious (or Masonic) ownership, operation, and management. It treats similarly situated, but competing, communities for the elderly differently. On this basis, the parties, in addition to their Establishment Clause challenge, also contend that N.C.G.S. § 105-275(32) offends the uniformity and the "law of the land" clauses of the North Carolina Constitution and the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution. However, the Court of Appeals did not decide the case on this basis, and we likewise find it unnecessary to address this issue in order to decide this case.

The United States Supreme Court has decreed that "the *Lemon v. Kurtzman* 'tests' are intended to apply to laws affording a uniform benefit to *all* religions." *Larson v. Valente*, 456 U.S. 228, 252, 72 L. Ed. 2d 33, 52-53 (1982) (referring to the three-part test set out in *Lemon v. Kurtzman*, 403 U.S. 602, 29 L. Ed. 2d 745 (1971), but applying strict scrutiny to laws which discriminate among religions or denominations). In this case, the classification made by N.C.G.S. § 105-275(32) affords "a uniform benefit" to all religious organizations which undertake to operate a home for the aged, sick, or infirm. Thus, the appropriate mode of analysis is an Establishment Clause inquiry, which utilizes the *Lemon* tests.

The *Lemon* requirements are that: (1) the law must serve a secular legislative purpose, (2) the principal or primary effect of the law must be one that neither advances nor inhibits religion, and (3) the law must not foster excessive government entanglement with religion. *Lemon*, 403 U.S. at 612-13, 29 L. Ed. 2d at 755; *see also Heritage Village Church*, 299 N.C. at 407-08, 263 S.E.2d at 731. We conclude that because N.C.G.S. § 105-275(32) excludes from property tax only those homes for the elderly that are owned and operated by religious or Masonic entities, while denying a similar benefit to identically situated secular homes, it has the "principal or primary effect" of advancing religion in violation of the second prong of the *Lemon* test.

In *Texas Monthly*, 489 U.S. 1, 103 L. Ed. 2d 1, the United States Supreme Court struck down, as a violation of the Establishment Clause, a sales tax exemption for religious publications where other

**IN RE SPRINGMOOR, INC.**

[348 N.C. 1 (1998)]

publications were subject to the tax. The Court stated that "the Constitution prohibits, at the very least, legislation that constitutes an endorsement of one or another set of religious beliefs or *of religion generally.*" *Id.* at 8, 103 L. Ed. 2d at 9 (emphasis added). N.C.G.S. § 105-275(32) impermissibly creates the same sort of specialized tax treatment based upon religious affiliation. This Court has likewise stated that the legislature "oversteps the bounds of [the] separation [of church and state] when it enacts a regulatory scheme which, whether in purpose, substantive effect, or administrative procedure, tends . . . to 'discriminate' along religious lines." *Heritage Village Church*, 299 N.C. at 406, 263 S.E.2d at 730. The property tax exclusion at issue here "discriminates" on its face in favor of religious organizations.

We recognize that "[i]t does not follow, of course, that government policies with secular objectives may not incidentally benefit religion." *Texas Monthly*, 489 U.S. at 10, 103 L. Ed. 2d at 10. However, while N.C.G.S. § 105-275(32) arguably has the objective of promoting and encouraging homes for the aged, sick, or infirm, it goes beyond "incidentally benefitting" those homes which are religiously owned and operated. Religiously affiliated homes are singled out for a tax benefit denied to others that are similarly capable of carrying out the secular objectives which the State may wish to encourage.

Religiously and Masonically affiliated organizations may indeed have a "long and proud history" of providing housing for the elderly. However, this is an insufficient basis upon which to confer a tax benefit that amounts to a "subsidy" to these homes, without providing a similar benefit to other organizations that desire to provide housing and care for the aged and that meet all of the statute's other requirements. *See id.* at 14, 103 L. Ed. 2d at 13 ("Every tax exemption constitutes a subsidy that affects non-qualifying taxpayers, forcing them to become 'indirect and vicarious "donors." ' " (quoting *Bob Jones Univ. v. United States*, 461 U.S. 574, 591, 76 L. Ed. 2d 157, 173 (1983))). To exclude from the tax base property owned only by religious (and Masonic) organizations which are carrying out this function " 'provide[s] unjustifiable awards of assistance to religious organizations' and cannot but 'conve[y] a message of endorsement' to slighted members of the community." *Id.* at 15, 103 L. Ed. 2d at 13 (quoting *Corporation of Presiding Bishop of Church of Jesus Christ of Latter-day Saints v. Amos*, 483 U.S. 327, 348, 97 L. Ed. 2d 273, 290-91 (1987) (O'Connor, J., concurring)).

**IN RE SPRINGMOOR, INC.**

[348 N.C. 1 (1998)]

To put this case in perspective, it is helpful to examine a decision of the Florida Supreme Court when it was faced with a converse situation. A Florida statute provided a tax exemption for

"[a]ll property, real and personal, of any bona fide home for the aged, licensed by the state board of health, owned and operated by Florida corporations not for profit, which has been and is currently exempt from the payment of taxes to the United States . . . and used by such home for the aged for the purposes for which it was organized . . . ."

*Johnson v. Presbyterian Homes of Synod of Florida, Inc.*, 239 So. 2d 256, 258 (Fla. 1970) (quoting Fla. Stat. Ann. § 192.06(14)(a) (1967)). The defendant tax collectors contended that the statute was unconstitutional as applied to homes for the aged owned by religious organizations. In upholding the tax exemption, the Florida Supreme Court stated:

It is apparent that [the statute] was enacted to promote the general welfare through encouraging the establishment of homes for the aged and not to favor religion, *since it is not limited to homes for the aged maintained by religious groups*, but applies to any which are owned and operated in compliance with the terms of the statute by Florida corporations not for profit. Under the circumstances, any benefit received by religious denominations is merely incidental to the achievement of a public purpose.

*Id.* at 261 (emphasis added).

Unlike the Florida case, North Carolina's statute excludes from taxation not *all* bona fide nonprofit homes for the aged but only homes for the aged owned by religious or Masonic bodies. The tax benefit bestowed on religious entities by N.C.G.S. § 105-275(32) is not "merely incidental," but rather is an exclusive benefit denied to other similarly situated nonprofit homes for the aged. To differentiate between those homes for the elderly which are religiously affiliated and those which are not so affiliated, in this case, results in the favoring of the religious over the secular.

For the foregoing reasons, we agree with the Court of Appeals that N.C.G.S. § 105-275(32)(v) "violates the constitutional prohibition against the establishment of religion as found in both the federal and [s]tate constitutions." *Springmoor*, 125 N.C. App. at 190, 479 S.E.2d at 799.

**IN RE SPRINGMOOR, INC.**

[348 N.C. 1 (1998)]

We now address the issue of severability. While the Court of Appeals correctly stated the doctrine of severability, we do not agree with its application in this case. When determining whether an unconstitutional portion of a statute may be severed and the remainder of the statute enforced, we look to the intent of the General Assembly. *Fulton Corp. v. Faulkner*, 345 N.C. 419, 421, 481 S.E.2d 8, 9 (1997). Courts may sever unconstitutional portions of statutes when consistent with the legislature's intended goal and when the remaining portions of the statute are " 'sufficient to accomplish their proper purpose.' " *State v. Fredell*, 283 N.C. 242, 245, 195 S.E.2d 300, 302 (1973) (quoting 16 Am. Jur. 2d *Constitutional Law* § § 181-182 (1964)). However, where the unconstitutional portion of a statute " 'is of such import that the other sections without it would cause results not contemplated or desired by the [l]egislature, then the entire statute must be held inoperative.' " *American Exch. Nat'l Bank v. Lacy*, 188 N.C. 25, 28, 123 S.E. 475, 476 (1924) (quoting *Connolly v. Union Sewer Pipe Co.*, 184 U.S. 540, 565, 46 L. Ed. 679, 692 (1902)). Thus, severance may be applied to save the remainder of a statute "if it is apparent that the legislative body, had it known of the invalidity of the one portion, would have enacted the remainder alone." *Jackson v. Guilford County Bd. of Adjustment*, 275 N.C. 155, 168, 166 S.E.2d 78, 87 (1969). The inclusion of a severability clause within a statute will be interpreted as a clear statement of legislative intent to strike an unconstitutional provision and to allow the balance to be enforced independently. *Fulton Corp.*, 345 N.C. at 422, 481 S.E.2d at 9.

Thus, our inquiry is not only whether the unconstitutional provision may be severed leaving a statute which is capable of enforcement, but also whether enforcement of the remainder, minus the offending provision, would be true to the legislative intent. We conclude that subpart (v), which sets out the requirement of religious or Masonic affiliation, is an integral part of the definition of a qualifying "home for the aged, sick, or infirm" contained in N.C.G.S. § 105-275(32) and may not be severed.

The Act was passed under the title "An Act to Classify Property Owned by Certain Nonprofit Homes for the Aged, Sick or Infirm and Exclude this Property from Taxation." Act of June 12, 1987, ch. 356, 1987 N.C. Sess. Laws 461. The language and title of the Act clearly indicate the General Assembly's intent to make this tax exclusion available only to certain rest homes, those which meet all six of the enumerated requirements. We note that homes for the aged, sick, or

infirm that own property used exclusively for "charitable" purposes qualify for a tax exemption under N.C.G.S. § 105-278.6(a)(2). Indeed, the Court of Appeals has pointed out that N.C.G.S. § 105-275(32) was enacted to grant tax-exempt status to certain communities which had lost their status as charitable as a result of a series of earlier Court of Appeals' decisions. *Barbour*, 112 N.C. App. at 378-79, 436 S.E.2d at 176-77. We conclude that the General Assembly carefully crafted the specific definition of a qualifying "home for the aged, sick, or infirm" found in N.C.G.S. § 105-275(32) and that it intended every element of the definition to be operative. We find no evidence that the General Assembly intended, by enacting this subsection, to provide a blanket exclusion for all nonprofit homes for the elderly. However, nothing in this opinion should be taken as suggesting that the General Assembly may not, in its wisdom, enact such an exclusion.

We further note that the approach taken by the Court of Appeals has the effect of broadening the tax exclusion. It has long been established that

> "[i]f by striking out a void exception, proviso, or other restrictive clause, the remainder, by reason of its generality, will have a broader scope as to subject or territory, its operation is not in accord with the legislative intent, and the whole would be affected and made void by the invalidity of such part."

*Keith v. Lockhart*, 171 N.C. 451, 458, 88 S.E. 640, 643 (1916) (holding that a discriminatory provision of a tax levy could not be severed) (quoting 1 J.G. Sutherland, *Statutes and Statutory Construction* § 306, at 597 (John Lewis ed., 2d ed. 1904)).

Finally, while the absence of a severability clause is not necessarily conclusive, it does provide evidence of legislative intent. *Cf. Fulton Corp.*, 345 N.C. at 422-24, 481 S.E.2d at 9-10 (holding that the presence of a severability clause demonstrated legislative intent). The General Assembly did not include a severability clause within N.C.G.S. § 105-275(32), nor is there any language within this subsection which would indicate an intent to allow the severance of any element from the definition of a "home for the aged, sick, or infirm." Therefore, we conclude that subpart (v) of N.C.G.S. § 105-275(32) may not be severed and that the entire subsection must fail.

Because we determine that the General Assembly did not intend to provide a blanket exclusion for all nonprofit homes for the elderly and that the Court of Appeals thus erred in severing subpart (v) from

**IN RE SPRINGMOOR, INC.**

[348 N.C. 1 (1998)]

N.C.G.S. § 105-275(32), we find it unnecessary to address the issue of whether severance was proper under Article V, Section 2 of the North Carolina Constitution.

For the foregoing reasons, we hold that N.C.G.S. § 105-275(32) is unconstitutional and that severance of the offending subpart (v) is not permissible.

AFFIRMED IN PART, REVERSED IN PART.

Justice LAKE dissenting.

The effective result of the majority's opinion, ensconced in the Establishment Clause, is to hold that the granting of a tax exemption to entities which do wholly secular work amounts to an unconstitutional state establishment of religion merely because *some* of them may be overseen by religious organizations. I must respectfully dissent for several reasons. First, such an interpretation of the Establishment Clause travels so far beyond its original purpose that it strains credulity. Second, even under current Establishment Clause jurisprudence, the tax exemption at issue in this case passes constitutional scrutiny. Finally, to the extent the parties in this case may raise a legitimate constitutional question, such claim would lie properly within the realm of Equal Protection and Due Process jurisprudence, not Establishment Clause jurisprudence.

An examination of the debates surrounding the adoption of the Establishment Clause, and the historical context within which it was framed, reveals that contrary to much popular belief, the founders were not opposed to but actually supported governmental aid to religion. The members of the First Congress, where the Bill of Rights was passed, were all too familiar with the established Church of England and the preferred position its members held in civic life. For these reasons, the First Congress sought to protect citizens of the new republic from the power of an established church and included in the First Amendment a prohibition against laws "respecting an establishment of religion." U.S. Const. amend. I.

This does not mean, however, that the authors of the Establishment Clause necessarily intended to prevent any state aid to religion or religiously affiliated groups. The debates over the adoption of the Establishment Clause reveal quite the contrary. The father of the Constitution himself, James Madison, opened the debates by preparing an amendment forbidding the establishment of "any

national religion." The House Select Committee worded Madison's proposal to read, "no religion shall be established by law." However, Benjamin Huntington of Connecticut objected on the grounds that such language might be construed as forbidding state laws that required contributions to support ministers and places of worship. Moreover, Huntington stated he was anxious to avoid any language that might "patronize those who professed no religion at all." 1 Abridgment of the Debates of Congress 137, 138 (15 August 1789). Similar concerns for the right of states to foster religion were raised and embodied in several different proposals for the Establishment Clause. For example, the Senate passed an amendment to the House version that would have only prohibited any law "establishing one religious sect or society in preference to others." The final version sent by the Senate to the House would have permitted the states and Congress to assist religious groups in various ways, so long as it was done on a nondiscriminatory basis. It read, "Congress shall make no law establishing articles of faith or a mode of worship." Further, when Peter Sylvester of New York objected to a version of the Establishment Clause because "it might be thought to have a tendency to abolish religion altogether," Madison replied that the language merely meant "Congress should not establish *a religion*, and enforce the legal observation of it by law." 1 Abridgment of the Debates of Congress 137 (emphasis added). The present language of the Establishment Clause was the result of a conference committee on which Madison served. It thus is clear that there was overwhelming support among the members of the First Congress for the ability of government to aid religion, albeit in a nondiscriminatory way, and that the language of the ratified Establishment Clause was intended to permit such assistance.

Many modernist and more trendy scholars and jurists have concluded that the drafters of the Establishment Clause sought to construct a high and impenetrable "wall of separation" against any state support or interaction with religion. In support of this contention, however, proponents of this view cite not the actual debates over the Establishment Clause, but primarily two outside sources, Madison's "Memorial and Remonstrance" and Thomas Jefferson's "An Act for Establishing Religious Freedom." *See, e.g., Capitol Square Review & Advisory Bd. v. Pinette*, 515 U.S. 753, 797, 132 L. Ed. 2d 650, 695 (1995) (Stevens, J., dissenting); *Everson v. Bd. of Educ. of Ewing*, 330 U.S. 1, 16, 91 L. Ed. 711, 723 (1947). However, Jefferson was not a member of the First Congress, and Madison's "Memorial" was not

written in reference to the First Amendment, but rather to a bill proposed in the Virginia legislature several years earlier that would have established funding for teachers of the Christian religion. In any event, the Establishment Clause was the product of a majority of members who plainly supported state aid of religion in general, and Madison participated in drafting a clause that allowed as much. Further, the same First Congress that passed the Establishment Clause also readopted, with Madison's approval, the Northwest Ordinance of 1787, of which the third article reads, "Religion, morality, and knowledge, being necessary to good government and the happiness of mankind, schools and the means of learning shall forever be encouraged." *See* Act of Aug. 7, 1789, Sess. I, ch. 8, 1 U.S. Statutes at Large 50 (an act to provide for the government of the territory northwest of the River Ohio). It hardly seems plausible that the same Congress which promoted religious and moral education by a territorial government under its federal authority could have intended the Establishment Clause to prevent any and all forms of assistance to religion.

With regard to modern Establishment Clause jurisprudence, perhaps the best that can be said is that it is far from being settled. For over 150 years after its passage, the Establishment Clause lay essentially dormant. It was not until 1947 in the case of *Everson*, 330 U.S. 1, 91 L. Ed. 711, that the current shape of Establishment Clause jurisprudence began to take form. After citing Madison's "Memorial and Remonstrance" and Jefferson's "An Act for Establishing Religious Freedom" for support, *id.* at 12-13, 91 L. Ed. at 721-22, the Court in *Everson* enunciated its frequently quoted interpretation of the Establishment Clause:

> The "establishment of religion" clause of the First Amendment means at'least this: Neither a state nor the Federal Government can set up a church. Neither can pass laws which aid one religion, aid all religions, or prefer one religion over another. Neither can force [or] influence a person to go to or to remain away from church against his will or force him to profess a belief or disbelief in any religion. No person can be punished for entertaining or professing religious beliefs or disbeliefs, for church attendance or non-attendance. No tax in any amount, large or small, can be levied to support any religious activities or institutions, whatever they may be called, or whatever form they may adopt to teach or practice religion. Neither a state nor the Federal Government can, openly or secretly,

participate in the affairs of any religious organizations or groups and vice versa.

*Id.* at 15-16, 91 L. Ed. at 723. In applying these principles, however, the Court went on to hold that a New Jersey program which used tax-raised funds to pay the bus fares of parochial school students did not violate the Establishment Clause. *Id.* at 17, 91 L. Ed. at 724.

In *Lemon v. Kurtzman,* 403 U.S. 602, 29 L. Ed. 2d 745 (1971), the Court sought to establish a test by which the principles of *Everson* could be applied in particular cases. Under the "three-part test" of *Lemon,* a statute must meet three criteria in order to survive scrutiny under the Establishment Clause: (1) the law must have a secular purpose, (2) its primary purpose or effect must neither advance nor inhibit religion, and (3) it must not foster excessive entanglement with religion. *Id.* at 612-13, 29 L. Ed. 2d at 755. The *Lemon* test has been applied fairly regularly since its enunciation, but it has come under substantial criticism by scholars and members of the Court alike for its less than clear or consistent application. *See, e.g., Edwards v. Aguillard,* 482 U.S. 578, 636-40, 96 L. Ed. 2d 510, 553-56 (1987) (Scalia, J., dissenting); *Wallace v. Jaffree,* 472 U.S. 38, 108-13, 86 L. Ed. 2d 29, 76-80 (1985) (Rehnquist, J., dissenting); *Roemer v. Maryland Bd. of Pub. Works,* 426 U.S. 736, 768-69, 49 L. Ed. 2d 179, 200-01 (1976) (White, J., concurring in judgment).

In the course of this constant reexamination and reformulation, the Court has paid particularly close attention of late to the second prong of *Lemon,* whether the primary purpose or effect of a law is to advance or to inhibit religion. This has led to the "endorsement" and the "coercion" analyses. The endorsement test examines whether the primary purpose or effect of the law is to endorse, promote or favor religious belief. *County of Allegheny v. ACLU,* 492 U.S. 573, 593, 106 L. Ed. 2d 472, 494-95 (1989) (display of creche in courthouse endorsed religious belief); *Texas Monthly,* 489 U.S. at 17, 103 L. Ed. 2d at 14 (tax exemption limited to religious periodicals "effectively endorses religious belief"). The coercion inquiry focuses on whether the activity advances religion by coercing individuals into listening to or participating in religious beliefs. *Lee v. Weisman,* 505 U.S. 577, 599, 120 L. Ed. 2d 467, 488 (1992). However, Establishment Clause jurisprudence is less than clear as a result of these two additional tests, since they have suffered from much of the same criticisms as their forebears, the three-part test of *Lemon. See, e.g., id.* at 636-39, 120 L. Ed. 2d at 512-14 (Scalia, J., dissenting) (criticizing coer-

## IN RE SPRINGMOOR, INC.

[348 N.C. 1 (1998)]

cion test); *Allegheny,* 492 U.S. at 655-63, 106 L. Ed. 2d at 535-40 (Kennedy, J., dissenting) (criticizing endorsement test).

In its most recent examination of the Establishment Clause, the Court has further muddied the *Lemon* waters by, in essence, collapsing the effects and entanglement prongs into a single test. *Agostini v. Felton,* —— U.S. ——, 138 L. Ed. 2d 391 (1997). This signals a return to an analysis applied by the Court prior to *Lemon* in the case of *Walz v. Tax Comm'n of N.Y.,* 397 U.S. 664, 25 L. Ed. 2d 697 (1970), discussed more fully *infra.* In *Agostini,* the Court recently stated:

> Regardless of how we have characterized the issue, however, the factors we use to assess whether an entanglement is "excessive" are similar to the factors we use to examine "effect." That is, to assess entanglement, we have looked to "the character and purposes of the institutions that are benefitted, the nature of the aid that the State provides, and the resulting relationship between the government and religious authority." Similarly, we have assessed a law's "effect" by examining the character of the institutions benefitted (*e.g.,* whether the religious institutions were "predominantly religious"), and the nature of the aid that the State provided (*e.g.,* whether it was neutral and nonideological). Indeed, in *Lemon* itself, the entanglement that the Court found "independently" to necessitate the program's invalidation also was found to have the effect of inhibiting religion. Thus, it is simplest to recognize why entanglement is significant and treat it— as we did in *Walz*— as an aspect of the inquiry into a statute's effect.
>
> *Not all entanglements, of course, have the effect of advancing or inhibiting religion. Interaction between church and state is inevitable, and we have always tolerated some level of involvement between the two. Entanglement must be "excessive" before it runs afoul of the Establishment Clause.*

*Agostini,* —— U.S. at ——, 138 L. Ed. 2d at 420 (citations omitted) (emphasis added). To the extent the Court's present analysis of the Establishment Clause can be distilled into a coherent framework, it appears the Court will undertake a two-part analysis. The first inquiry will be whether the state action has a secular purpose, and the second will be whether the primary purpose or effect of the state's action is to advance or inhibit religion. Among the factors to be considered in determining "effect" will be such things as entanglement, endorsement and coercion.

Notwithstanding the confused state of Establishment Clause jurisprudence, it seems clear that the statute at issue in the present case passes constitutional scrutiny for two primary reasons. First, I believe the Supreme Court's holding in *Walz* clearly controls the outcome of this case, and the majority's analysis reflects an unduly narrow application of the statute at issue to *Walz*. Second, I believe the majority's reliance on the second prong of the test set forth in *Lemon v. Kurtzman*, 403 U.S. 602, 29 L. Ed. 2d 745, as grounds for striking down the statute represents a misapplication of current Establishment Clause jurisprudence.

In *Walz*, the Supreme Court examined the constitutionality of a New York statute that in part granted religious organizations an exemption from real and personal property taxes. *Walz*, 397 U.S. at 666, 25 L. Ed. 2d at 700. The exemption was authorized by a provision in the New York Constitution which permitted the legislature to pass general laws exempting religious, educational or charitable nonprofit organizations from real or personal property taxes. *Id.* Pursuant to this authorization, the New York legislature enacted an exemption statute that

> includes churches *in a long list* of nonprofit organizations: for the moral or mental improvement of men and women (§ 420); for charitable, hospital, or educational purposes (ibid.); for playgrounds (ibid.); for scientific or literary objects (ibid.); for bar associations, medical societies, or libraries (ibid.); for patriotic and historical purposes (ibid.); for cemeteries (ibid.); for the enforcement of laws relating to children or animals (ibid.); for opera houses (§ 426); for fraternal organizations (§ 428); for academies of music (§ 434); for veterans' organizations (§ 452); for pharmaceutical societies (§ 472); and for dental societies (§ 474).

*Id.* at 707-08, 25 L. Ed. 2d at 723-24 (emphasis added). The Supreme Court held that such an exemption did not constitute a violation of the Establishment Clause of the First Amendment to the United States Constitution. *Id.* at 680, 25 L. Ed. 2d at 708.

In reaching this conclusion, the Supreme Court began its analysis by recognizing that to the framers of the First Amendment, and to their contemporaries, "the 'establishment' of a religion connoted sponsorship, financial support, and active involvement of the sovereign in religious activity," as was the situation in England at the time of our Revolution. *Id.* at 668, 25 L. Ed. 2d at 701. More recently, the

## IN RE SPRINGMOOR, INC.

[348 N.C. 1 (1998)]

Court noted, Establishment Clause jurisprudence has sought a position of neutrality toward religion. *Id.* at 668-69, 25 L. Ed. 2d at 701. " 'The First Amendment, however, does not say that in every and all respects there shall be a separation of Church and State,' " *id.* at 669, 25 L. Ed. 2d at 701 (quoting *Zorach v. Clauson*, 343 U.S. 306, 312, 96 L. Ed. 954, 961 (1952)), and "the constitutional neutrality imposed on us 'is not so narrow a channel that the slightest deviation from an absolutely straight course leads to condemnation,' " *id.* (quoting *Sherbert v. Verner*, 374 U.S. 398, 422, 10 L. Ed. 2d 965, 981 (1963) (Harlan, J., dissenting)). Thus, the Court recognizes that a determination of whether the principle of neutrality has been obviated turns on whether a statute intends to, or has the effect of, either advancing or interfering with religious beliefs or practices. *Id.* at 669, 25 L. Ed. 2d at 702.

In so determining, however, the *Walz* Court concludes that "[t]he legislative purpose of a property *tax exemption* is *neither* the advancement nor the inhibition of religion; it is *neither* sponsorship nor hostility." *Id.* at 672, 25 L. Ed. 2d at 703 (emphasis added). The reasons the Court gives for this conclusion are several. First, governments have not always been tolerant of religious activity, and "[g]rants of *exemption* historically reflect the concern of authors of constitutions and statutes as to the latent dangers inherent in the imposition of property taxes." *Id.* at 673, 25 L. Ed. 2d at 704 (emphasis added). Another is the deeply rooted and long-established practice of providing tax exemptions for religious organizations. *Id.* at 676-78, 25 L. Ed. 2d at 705-07. As stated by Justice Brennan in his concurrence, "Rarely if ever has this Court considered the constitutionality of a practice for which the historical support is so overwhelming." *Id.* at 681, 25 L. Ed. 2d at 709 (Brennan, J., concurring). The third, and arguably most important, reason given by the Court for its holding was that "New York, in common with the other States, has determined that certain entities that exist in a harmonious relationship to the community at large, and that foster its 'moral or mental improvement,' should not be inhibited in their activities by property taxation or the hazard of loss of those properties for nonpayment of taxes." *Id.* at 672, 25 L. Ed. 2d at 703. The Court then recognized that in so doing, the legislature had not singled out religious organizations, but had included them within a statute exempting a multitude of organizations it deemed as beneficial to the state. *Id.* at 672-73, 25 L. Ed. 2d at 703-04. Justice Brennan expanded on this concept in his concurrence by recognizing that "[g]overnment has *two basic secular purposes* for granting real property tax exemptions to religious

organizations." *Id.* at 687, 25 L. Ed. 2d at 712 (Brennan, J., concurring) (emphasis added).

> First, these organizations are exempted because they, among a range of other private, nonprofit organizations contribute to the well-being of the community in a variety of nonreligious ways, and thereby bear burdens that would otherwise either have to be met by general taxation, or be left undone to the detriment of the community. . . .
>
> . . . .
>
> Second, government grants exemptions to religious organizations because they uniquely contribute to the pluralism of American society by their religious activities. Government may properly include religious institutions among the variety of private, nonprofit groups that receive tax exemptions, for each group contributes to the diversity of association, viewpoint, and enterprise essential to a vigorous, pluralistic society.

*Id.* at 687-89, 25 L. Ed. 2d at 712-13 (Brennan, J., concurring). "The very breadth of [New York's] scheme of exemptions negates any suggestion that the State intends to single out religious organizations for special preference." *Id.* at 689, 25 L. Ed. 2d at 713 (Brennan, J., concurring).

In the case *sub judice*, the situation is almost identical to that faced in *Walz*. Here, N.C.G.S. § 105-275(32) exempts from real and personal property taxation certain religiously or Masonically affiliated nonprofit continuing care facilities for the elderly. It is significant that subsection (32) does not favor any particular religion or denomination therein, nor does it favor religious groups alone, as Masonically affiliated homes for the elderly are also exempt. More importantly, subsection (32) is only one part of the much larger statutory exemption scheme of section 105-275 which, like the one in *Walz*, is authorized by our state Constitution. Also, like the statute in *Walz*, section 105-275 exempts from taxation a multitude of other secular organizations and activities.

Section 105-275 is entitled "Property classified and excluded from the tax base," and it provides, "The following classes of property are hereby designated special classes under authority of Article V, Sec. 2(2) of the North Carolina Constitution and shall not be listed, appraised, assessed, or taxed." N.C.G.S. § 105-275 (1997). The statute then proceeds to define in excess of thirty-two classes of property in

## IN RE SPRINGMOOR, INC.

[348 N.C. 1 (1998)]

some forty subsections (several having been repealed) that are exempt from taxation. Included are such things as: tangible personal property that has been imported and is being stored in the state for further shipment (for the purpose of enhancing our ports) (subsection (2)); nonprofit water or sewer associations (subsection (3)); vehicles given to disabled veterans (subsection (5)); real and personal property for public parks (subsection (7)); real and personal property used for pollution control (subsection (8.a.)) and recycling (subsection (8.b.)); real property used for protected nature reserves (subsection (12)); real and personal property belonging to fraternal organizations such as the Masons (subsection (18)), Moose, and Elks (subsection (19)), or belonging to Goodwill Industries (subsection (20)); personal property held in a Foreign Trade Zone (subsection (23)); real property and easements held for historic preservation (subsections (29)-(30)); poultry and livestock feed (subsection (37)); and even computer software (subsection (40)). The inclusion here of a tax exemption for religiously affiliated homes for the elderly within a broad range of other secular beneficial organizations and activities is virtually indistinguishable from the situation and statute in *Walz*, where the United States Supreme Court emphatically found no violation of the Establishment Clause. It is abundantly clear that *Walz* should control this case.

The majority attempts to distinguish *Walz* on the ground that the "classification of property addressed by the statute in question here is '[r]eal and personal property owned by a home for the aged, sick, or infirm' " and that this is dissimilar from the "broad class of properties" at issue in *Walz. In re Springmoor, Inc.*, 348 N.C. 1, 8, 498 S.E.2d 177, 182 (1998). By this light brush, the majority totally overlooks the similarly broad sweep and purpose of section 105-275 and severely restricts, as with blinders, the scope of the Court's inquiry to examine only the favoring of religiously affiliated homes for the elderly and not the broad secular purpose of the statute as a whole. What the majority fails to realize is that the appellants in *Walz* also attempted a similar tack and did not succeed. In discussing the broad secular purposes behind the exemption statute in *Walz*, Justice Brennan noted that "[a]ppellant seeks to avoid the force of this secular purpose of the exemptions by *limiting* his challenge to 'exemptions from real property taxation to religious organizations on real property used exclusively for religious purposes.' " *Walz*, 397 U.S. at 688, 25 L. Ed. 2d at 712 (Brennan, J., concurring) (emphasis added). In the instant case, it is inappropriate, if not implausible, to separate out subsection (32) and consider its constitutionality in isolation. In

fact, subsection (32) has no meaning or effect when considered in isolation. Subsection (32) is merely one subsection among many that simply define, within the overall purpose, the classes of property exempted by the general exemption authorization language of section 105-275.

The majority attempts to distinguish this case from *Walz* on the ground that Article V, Section 2(2) of the North Carolina Constitution "gives the General Assembly the power of 'classification,' as distinguished from 'exemption,' " and therefore "[t]his statute's function is to describe a separate class of property for exclusion from the tax base, rather than to provide a tax exemption to religious organizations for property used for religious purposes." *Springmoor*, 348 N.C. at 8, 498 S.E.2d at 181-82. This seems to me to be a distinction without a difference. The power of exemption *is* the power to classify things for exclusion from taxation. Further, the Court's decision in *Walz* did not rest on state constitutional granting power, but rather on the broad classification of properties and organizations in the *statute itself.*

When subsection (32) is properly considered within the larger statutory structure and purpose of section 105-275, two things are evident. First, subsection (32) is just one of many classes of property, and the only class of a religious character, that has been exempted from property taxation by the legislature under the authority of our state Constitution. Second, and more important, subsection (32) is but one class among a broad class of properties and activities whose purpose for exemption is the general and secular benefit of the state at large, whether it be commerce, parks, fraternal organizations or housing for the elderly. These considerations bring the statute at issue squarely within the reasoning of the Supreme Court in *Walz*.

The majority next cursorily concludes that there is "no legitimate secular objective sufficient to justify" the tax exemption for only religiously and Masonically affiliated homes. *Springmoor*, 348 N.C. at 9, 498 S.E.2d at 182. This ignores the "two basic secular purposes for granting real property tax exemptions to religious organizations" as stated in *Walz*: (1) the contribution of religious organizations to the community in nonreligious ways, and (2) their contribution to the pluralism of American society. *Walz*, 397 U.S. at 687, 25 L. Ed. 2d at 712 (Brennan, J., concurring). These two purposes are plainly evident in the case *sub judice*. Religiously and Masonically affiliated organizations have a long and proud history of providing housing for the

**IN RE SPRINGMOOR, INC.**

[348 N.C. 1 (1998)]

elderly in North Carolina. In fact, the legislature's denomination of religious and Masonic homes as those qualifying for exemption was an explicit recognition of the prominent past and present work done by these two specific classifications of organizations in the housing of the elderly. As the Supreme Court recently noted, "Justice Holmes' aphorism that 'a page of history is worth a volume of logic' applies with particular force to our Establishment Clause jurisprudence." *Weisman*, 505 U.S. at 632, 120 L. Ed. 2d at 510 (Scalia, J., dissenting) (quoting *New York Trust Co. v. Eisner*, 256 U.S. 345, 349, 65 L. Ed. 963, 983 (1921)). Providing housing that would otherwise have to be provided by the government is an important secular role that gains importance daily in this era of shrinking government funding. Further, the ability of religious and Masonic organizations to provide housing to the elderly in faith-based or ideal-based environments substantially contributes to the "diversity of association, viewpoint, and enterprise essential to a vigorous, pluralistic society," and does so in ways not possible by other public or private homes for the elderly. *Walz*, 397 U.S. at 689, 25 L. Ed. 2d at 713 (Brennan, J., concurring). These secular purposes for the exemptions found in subsection (32) bring the statute squarely within the constitutional parameters of *Walz*. *See also Texas Monthly*, 489 U.S. at 10, 103 L. Ed. 2d at 10 (the Supreme "Court has *never* required that public authorities refrain from implementing reasonable measures to advance legitimate secular goals *merely because* they would thereby relieve religious groups of costs they would otherwise incur") (emphasis added).

The majority next holds that subsection (32) violates the second prong of the *Lemon* test. This is based on the conclusion that, "because [the subsection] excludes from property tax only those homes for the elderly which are owned and operated by religious or Masonic entities, while denying a similar benefit to identically situated secular homes," the subsection has the primary effect of advancing religion. *Springmoor*, 348 N.C. at 10, 498 S.E.2d at 183. This conclusion is at odds with *Walz* and the Supreme Court's more recent pronouncements in this regard. The Supreme Court has consistently held that tax exemptions do not have the primary effect of advancing religion. In *Walz*, Justice Brennan recognized that tax exemptions are "qualitatively different" from tax subsidies because they "[assist] the exempted enterprise only passively, by relieving a privately funded venture of the burden of paying taxes." *Walz*, 397 U.S. at 690, 25 L. Ed. 2d at 713-14 (Brennan, J., con-

curring). While, as the *Walz* Court noted, "[g]ranting tax exemptions . . . necessarily operates to afford an indirect economic benefit[,] . . . [t]he grant of a tax exemption is not sponsorship since the government does not transfer part of its revenue to churches but simply abstains from demanding that the church support the state." *Id.* at 674-75, 25 L. Ed. 2d at 705. The Supreme Court recently reaffirmed the *Walz* Court's finding of a "constitutionally significant difference between subsidies and tax exemptions." *Camps Newfound/ Owatonna, Inc. v. Town of Harrison,* —— U.S. ——, ——, 137 L. Ed. 2d 852, 873-74 (1997). To reiterate, the exemption of religious organizations from taxes is neither advancement nor sponsorship of religion. *Walz*, 397 U.S. at 672, 25 L. Ed. 2d at 703. It is thus inconceivable to me just how the granting of such an exemption, especially such a denominationally neutral and secularly goal-oriented one as we have here, can have the primary effect of advancing religion in violation of the second prong of *Lemon*.

Moreover, the majority misapprehends the proper focus of the effects test. Recent Court decisions make it clear that, in order to fail the effects test, a state law or action must have the primary purpose or effect of advancing religious *beliefs*, not just religion or religious groups. This is evident from a comparison of recent applications of the Establishment Clause. In *Agostini*, the Supreme Court overturned its own earlier decision and held that a program for providing public remedial education teachers in parochial schools did not violate the Establishment Clause. The Court's primary reasoning was that there was no concern the public teachers would "indoctrinate" the students with religious beliefs. *Agostini*, —— U.S. at ——, 138 L. Ed. 2d at 414-16. Likewise, in *Zobrest v. Catalina Foothills Sch. Dist.*, 509 U.S. 1, 125 L. Ed. 2d 1 (1993), the Court upheld the public provision of sign-language interpreters accompanying deaf students at parochial schools on the ground that the interpreters were not likely to indoctrinate the students with religious ideas. In *Hernandez v. Comm'r of Internal Revenue*, 490 U.S. 680, 104 L. Ed. 2d 766 (1989), the Court upheld section 170 of the Internal Revenue Code, which allows deductions for contributions to religious organizations, on the ground that the primary effect of section 170 is to encourage gifts to charitable organizations, not to advance religious beliefs.

In comparison, the Court's recent holdings that find violations of the Establishment Clause involve the promotion of religious beliefs by the state. In *Bd. of Educ. of Kiryas Joel Village Sch. Dist. v. Grumet*, 512 U.S. 687, 129 L. Ed. 2d 546 (1994), the Court struck down

**IN RE SPRINGMOOR, INC.**

[348 N.C. 1 (1998)]

the drawing of school district lines to coincide with an almost exclusively Hasidic Jewish community in part on the ground that it impermissibly advanced the religious ideas of one specific religious sect. In *Weisman*, 505 U.S. 577, 120 L. Ed. 2d 467, the Court held that a graduation prayer impermissibly supported religious belief by coercing students to listen to a religious message. Similarly, in *County of Allegheny v. ACLU*, 492 U.S. 573, 106 L. Ed. 2d 472, the Court struck down the erection of a creche in a courthouse on the ground that it endorsed the particular religious message conveyed therein. Finally, in *Texas Monthly*, 489 U.S. 1, 103 L. Ed. 2d 1, a case cited as authority by the majority, the Court struck down a tax exemption exclusively for periodicals that promulgated teachings of religious faith because the exemption impermissibly supported religious belief.

What distinguishes those cases held not to have the "effect" of advancing religion from those that do is that the former deal with state action that benefits religion only secondarily, while the latter deal with state action promoting a particular religious belief or religious beliefs as a whole. In the case *sub judice*, the primary purpose and effect of the statute is to promote housing for the elderly, *not* to advance any religious beliefs held by the groups overseeing the homes. The majority points to no evidence that state indoctrination of religion is taking place in these facilities, or that the residents are being coerced by the state to listen to religious or Masonic messages. It cannot be seriously contended that the state, by this statutory scheme, is endorsing any religious, Masonic or other belief by the exemption here involved any more than it does by exempting the Elks, Moose or other fraternal organizations. The granting of a property tax exemption, especially for a secular activity, simply does not even approach the same implication of state endorsement of religious belief that could be inferred by the official placing of a religious symbol on a city seal or in a courthouse.

Finally, to the extent the parties in this case *might* have a cognizable claim, it properly lies within the purview of the Equal Protection and Due Process Clauses, not the Establishment Clause. The majority's primary "bone of contention," as well as its reason for finding the "effect" of advancing religion, is that religiously and Masonically affiliated homes for the elderly are granted exemptions while other similarly situated homes are not. This obviously arises out of the majority's reading of Supreme Court cases requiring the state to show "neutrality" toward religion. *Springmoor*, 348 N.C. at 5, 498 S.E.2d at 180. However, neutrality in this context does not

**IN RE SPRINGMOOR, INC.**

[348 N.C. 1 (1998)]

mean completely ignoring or severing all ties with religion, as the cases referenced above illustrate. As Justice Goldberg recognized in *School Dist. of Abington v. Schempp*, 374 U.S. 203, 10 L. Ed. 2d 844 (1963),

> untutored devotion to the concept of neutrality can lead to invocation or approval of results which partake not simply of that noninterference and noninvolvement with the religious which the Constitution commands, but of a brooding and pervasive devotion to the secular and a passive, or even active, hostility to the religious. Such results are not only not compelled by the Constitution, but, it seems to me, are prohibited by it.

*Id.* at 306, 10 L. Ed. 2d at 905-06 (Goldberg, J., concurring). So long as the state does not act with the primary purpose or effect of advancing religious belief, it does not run afoul of the Establishment Clause even though it may obliquely aid religion in general in some way that it does not aid secular persuasions. Claims seeking redress for apparent inequalities in state treatment belong within the Equal Protection and Due Process guarantees. Neither the Court of Appeals nor the majority addressed this issue, and it therefore is beyond the scope of this dissent to do so.

Because this decision extends well beyond the original meaning and purpose of the Establishment Clause, and since we are dealing here with a tax exemption which is part of a statute designed to encourage a broad class of organizations and activities whose overall purposes are secular, I cannot sanction the majority's finding of an Establishment Clause violation. As Justice Brennan stated, "I must conclude that the exemptions do not 'serve the *essentially religious activities* of religious institutions.' Their principal effect is to carry out *secular purposes*—the encouragement of public service activities and of a pluralistic society." *Walz*, 397 U.S. at 692, 25 L. Ed. 2d at 715 (Brennan, J., concurring) (emphasis added). The exemption at issue comports with the principles established in *Walz*, *Lemon* and *Lemon's* progeny, and the Court of Appeals should be reversed.

The majority opinion correctly states that "we do not lightly strike down an enactment of the General Assembly," and we should not do so in this instance, with this important part of the taxing scheme of this state, especially upon a false premise.

Justices Parker and Orr join in this dissenting opinion.